**EASTWOOD NURSING AND RE-HABILITATION CENTER,**
Petitioner

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 6, 2006.
Decided Nov. 3, 2006.

**136**

Carol Brayshaw Longwell, Harrisburg, for petitioner.

Edward G. Cherry, Asst. Counsel, Harrisburg, for respondent.

BEFORE: PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge COHN JUBELIRER.

Eastwood Nursing and Rehabilitation Center (Eastwood) petitions for review of the order of the Bureau of Hearings and Appeals (BHA) of the Department of Public Welfare (Department) denying Eastwood's appeal from a decision of the Department's Bureau of Long Term Care Programs (LTC Bureau). The LTC Bureau denied Eastwood's request for enrollment in the Medical Assistance (MA) Program so that its 97 beds could be used by MA recipients.

## I. BACKGROUND

MA is a joint federal and state program, and must be administered *consistent with both federal and state law*.[1] *Alexander v.*

*Choate*, 469 U.S. 287, 303, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985). The state MA Program is authorized by Article IV of the Pennsylvania Public Welfare Code,[2] and must be administered in conformity with requirements of Title XIX of the Social Security Act, 42 U.S.C. § 1396–1396(q), and regulations promulgated thereto. *See* 55 Pa.Code § 1101.11(b). To ensure compliance with federal requirements, the General Assembly determined that "[t]he [D]epartment shall have the power and its duties shall be: ... to act as the sole agency of the State when applying for, receiving and using Federal funds for the financing in whole or in part of programs in fields in which the [D]epartment has responsibility." Section 201 of the Public Welfare Code, 62 P.S. § 201(1). The Department is empowered to develop and submit state plans, promulgate regulations, establish and enforce standards, and to take such other measures as necessary to render the Commonwealth eligible for federal funds and other assistance. 62 P.S. § 201(2). It is also authorized to prioritize and assess the need for construction, modernization and additional services. 62 P.S. § 201(3).

Accordingly, it is within the Department's responsibility to enter into provider agreements with nursing facilities seeking to obtain reimbursement from the MA Program for providing services to MA recipients. *See* 42 C.F.R. § 442.101(a). Under the state MA Program, the Department pays for various medical services,

---

1. As explained in *Alexander v. Choate*, 469 U.S. 287, 290 n. 1, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985):

    Medicaid is a joint state-federal funding program for medical assistance in which the Federal Government approves a state plan for the funding of medical services for the needy and then subsidizes a significant portion of the financial obligations the State has agreed to assume. Once a State volun-

tarily chooses to participate in Medicaid, the State must comply with the requirements of Title XIX [of the Social Security Act, 42 U.S.C. § 1396–1396(q) ] and applicable regulations. *Harris v. McRae*, 448 U.S. 297, 301, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980).

2. Act of June 13, 1967, P.L. 31, *as amended,* 62 P.S. §§ 401–488.

including two types of long term care services: (1) nursing facility services—provided to persons residing in institutional settings, such as nursing facilities, and (2) home and community-based services—provided to persons living in their homes or other community-based settings.

Before a nursing facility can participate in the state MA Program, it must be licensed by the Pennsylvania Department of Health (DOH). 55 Pa.Code § 1187.21(1). From 1980 to 1996, DOH required that, before receiving approval for the establishment of new health care facilities and/or the expansion of existing facilities, an applicant had to apply for and receive a Certificate of Need (CON). To obtain a CON, an applicant was required to provide details as to how the proposed project would address the need for services or facilities in the area as set forth in the State Health Services Plan (SHSP),[3] which included, *inter alia*, projections of the need for long-term care beds for all persons in the Commonwealth.

Prior to December, 1996, the Department had relied, in part, on the CON process to comply with the federally prescribed standards for MA. (BHA Findings

of Fact 6/13/05 (FOF) ¶ 2.) However, the General Assembly subsequently determined that health care facilities no longer needed to obtain prior approval before establishing new health care facilities or expanding existing facilities and allowed those sections of the Act that authorized the CON process to sunset; as a result, on December 18, 1996, "the 'sun set' on the CON process by legislative fiat."[4] *Millcreek Manor v. Department of Public Welfare*, 796 A.2d 1020, 1023 (Pa.Cmwlth. 2002). Nevertheless, the Department's obligations to safeguard the MA Program remained.[5] *Millcreek*, 796 A.2d at 1023.

## A. Statement of Policy

To meet those obligations, the Department issued a Statement of Policy (SOP), announcing how it intended to exercise its regulatory discretion to reduce MA reliance on institutional services, to encourage the growth and use of home and community-based services, and to promote the efficient and economic operation of the MA program while providing quality care to MA recipients. (Statements of Policy, R. vol. 1, DPW Ex. 11.)[6]

---

**3.** *See* Health Care Facilities Act, Act of July 19, 1979, P.L. 130, *as amended*, 35 P.S. § 448.201(6).

**4.** On this date, the Legislature terminated Chapter 7 and all other provisions of the Health Care Facilities Act (HCFA), Act of July 19, 1979, P.L. 130, *as amended*, 35 P.S. §§ 448.701–448.712, relating to the CON Process. Section 904.1 of the HCFA, added by the Act of December 18, 1992, P.L. 1602, 35 P.S. § 448.904a; *see also Millcreek Manor v. Department of Public Welfare*, 796 A.2d 1020, 1023 (Pa.Cmwlth.2002).

**5.** The CON requirement was one of the mechanisms used by the Department to safeguard against unnecessary utilization of institutional services and to assure that payments for these types of services were consistent with efficiency, economy and quality of care. 26 Pa. Bull. 5996 (Dec. 14, 1996). The sunset of the CON

program removed an important safeguard and created the risk of increased and uncontrolled costs to the MA program. Id.

**6.** Section 1101.42b of the Pennsylvania Code, entitled "Certificate of Need requirement for participation—statement of policy," provides:

(a) Effective December 19, 1996, the Department will not enter into a provider agreement with an ICF/MR, nursing facility, an inpatient psychiatric hospital or a rehabilitation hospital unless the Department of Health issued a Certificate of Need authorizing construction of the facility or hospital in accordance with 28 Pa.Code Chapter 401 (relating to Certificate of Need program) or a letter of nonreviewability indicating that the facility or hospital was not subject to review under 28 Pa.Code Chapter 401 dated on or before December 18, 1996.

The SOP provides that, pursuant to its discretionary authority under 55 Pa.Code § 1101.77(b)(1),[7] and as a general rule, the Department will not enter into agreements with providers who seek enrollment in the MA program and will terminate the provider agreements of existing providers that add beds without first proving the addition of beds is in the "Department's best interests." However, under 55 Pa. Code § 1101.77a(b),[8] the Department also announced that it would consider "exceptions" to its general policy that no additional MA beds are needed on a case—by—case basis, pursuant to guidelines published at 55 Pa.Code § 1187.21a, entitled "[n]ursing facility exception requests—statement of policy."

The Department advised that, in deciding whether to permit a nursing facility to enroll or to expand under 55 Pa.Code § 1187.21a, it considered the most important factor to be the MA program's need for additional nursing facility services in the applicant's primary service area. 28 Pa. Bull. 140 (January 10, 1998); 55 Pa. Code § 1187.21a(g)(1). The focus of the Department's analysis in determining the "MA program's need" would primarily consider whether the program actually needs additional services and, if so, how those services could be most appropriately supplied. 28 Pa. Bull. 140–41 (January 10, 1998). The broader needs of the community would be relevant to the extent they affected the availability of beds to the MA program and the availability of nursing facility services to MA recipients in those beds. 28 Pa. Bull. 141 (January 10, 1998); 55 Pa.Code § 1187.21a(g)(1)(i) and (vi). In addition, the Department would examine whether those needs could be met through the provision of home and community-based services, rather than additional nursing facility beds.[9] 28 Pa. Bull. 141 (January 10, 1998); 55 Pa.Code § 1187.21a(g)(1)(v). The Department instructed that it would grant an exception if it determined the provider has demonstrated an increase in the number of MA beds is in the Department's best interest. 55 Pa.Code § 1187.21a(c).

## B. Eastwood Nursing and Rehabilitation Center

Eastwood is a licensed nursing facility located in Northampton County, which has been in operation for more than forty years. (FOF ¶ 22.) On June 30, 2000, Eastwood submitted an exception request

---

(b) The Department will consider exceptions to subsection (a) on a case-by-case basis. Exceptions requested by nursing facilities will be reviewed under § 1187.21a (relating to nursing facility exception requests—statement of policy).
55 Pa.Code § 1101.42b.

7. Section 1101.77(b)(1) provides:

(b) Departmental termination of the provider's enrollment and participation.
(1) The Department may terminate the enrollment and direct and indirect participation of, and suspend payments to, any provider upon 30 days advance notice for the convenience or best interest of the Department.

The provisions of Section 1101.77 were adopted November 18, 1983, and became effective November 19, 1983. 13 Pa. Bull. 3653.

8. The provisions of Section 1101.77a were adopted December 13, 1996, and became effective December 14, 1996. 26 Pa. Bull. 5996.

9. The Department advised that it would also examine other facts in reviewing exception requests, including, *inter alia*: overall occupancy rates; MA occupancy rates; admission rates of Day–One MA Eligible Recipients; the facility's willingness to serve technology-dependent consumers; and, whether less costly or more appropriate alternatives are available to MA recipients in the provider's area. 28 Pa. Bull. 141 (January 10, 1998); 55 Pa.Code § 1187.21a(g)(1)(i)-(vi).

to participate in the MA program in order to: (1) ensure continued access for current residents who wish to remain in the facility after becoming MA-eligible; and (2) fill the need for additional MA beds. (FOF ¶ 24; Exception Request dated 6/30/00, R. vol. 1, DPW Ex. 2.)

In support of its exception request, Eastwood informed the LTC Bureau that expenses for Medicare-eligible patients are covered for twenty days of care in a skilled nursing facility. However, if the Medicare recipient requires more than twenty days and has MA as his or her secondary payer source, Eastwood cannot provide care for that individual unless it does so for free. At that point, such residents must be placed in an MA-participating facility. Eastwood's residents who become eligible for MA, some of whom have been at the facility for years, are forced to move to another facility because the Department will pay for their care only in a MA-participating nursing facility. This, according to Eastwood, disrupts continuity of care and interrupts continuing therapeutic efforts. Further, Eastwood informed the LTC Bureau that many residents living in the city of Easton, who suffer from multiple and complex medical conditions, need services provided in the local Easton area. Eastwood can satisfy this need because it is located directly across the street from Easton Hospital and, thus, receives high acuity patients who require significant levels of therapy, pain management, and wound care management. Eastwood also informed the LTC Bureau that its facility provides intense services, and is the only facility with a full-time respiratory therapist. As such, Eastwood contends that its services and care are unmatched by other facilities in the area.

By letters dated October 30, 2000, the Administrators from two nursing facilities in the County objected to Eastwood's request for enrollment in the MA program. After considering all of the information that Eastwood submitted to the LTC Bureau, including Eastwood's response to the objection letters, the LTC Bureau denied Eastwood's request for enrollment into the MA program. By letter dated December 29, 2000, the LTC Bureau provided two reasons for this denial: (1) there was no need for additional MA nursing facility services in the County; and, (2) more appropriate and less costly options, such as community-based services through the Pennsylvania Department of Aging (PDA) waiver program,[10] were available to meet any MA need that existed. (FOF ¶ 33.)

In denying Eastwood's request, the LTC Bureau examined capacity, MA penetration, reports that confirmed that capacity was adequate, and the availability of home and community-based services. (FOF ¶ 45.) The LTC Bureau explained that, in determining whether there was adequate capacity, it had examined the overall occupancy rates in facilities that were enrolled in the MA program; the number of individuals who were on SSI in the County, as compared to the State; the number of individuals eligible for MA in the County, as compared to the State; and the number of nursing facility beds "coming on-line" in the County in the near future. (FOF ¶ 46.)

Eastwood appealed the LTC Bureau's denial of its request to the Department's BHA. The administrative law judge (ALJ) conducted two full days of hearings on November 14 and 15, 2001, wherein 8 witnesses testified and 137 exhibits were in-

---

10. The Pennsylvania Department of Aging (PDA) waiver program permits the Commonwealth to provide long-term care services in the community as an alternative to providing services in nursing facilities. (FOF ¶ 62.)

troduced into evidence. Post-hearing briefs and reply briefs were subsequently filed on March 21, April 12, and April 22, 2002. However, it was not until three years later, on May 20, 2005, that the ALJ issued her recommendation to deny Eastwood's appeal. Thereafter, on June 13, 2005, Thomas Cheffins, Chief ALJ for the BHA, ordered the recommendation of the ALJ "be adopted in its entirety." On July 13, 2005, Eastwood petitioned this Court for review.[11]

### C. Millcreek Manor Case

Before we address Eastwood's arguments, we recognize that this SOP has previously been challenged before our Court. Millcreek Manor, which operates a nursing facility in Erie, Pennsylvania, submitted an exception request to the LTC Bureau, seeking to relocate and expand its nursing facility; it requested the Department re-certify its existing MA beds and certify 18 additional MA beds. *Millcreek,* 796 A.2d at 1023. The LTC Bureau granted Millcreek permission to relocate its existing 33 MA beds. However, it denied Millcreek's request to expand its certified MA bed capacity for two reasons: (1) there was a surplus of beds in Millcreek's primary service area; and (2) there were "more appropriate and less costly options . . . available to meet the needs of the MA population." Id. at 1024. Pursuant to provisions in the Department's SOP, the LTC Bureau advised Millcreek that its participation in the MA Program would be terminated if it added additional beds to

its facility, and further advised Millcreek of its right to appeal the decision. Id. at 1024. Millcreek then appealed, challenging the SOP on grounds that it was illegal and inconsistent with Federal law.

Despite these claims, however, the ALJ hearing Millcreek's case precluded Millcreek from challenging the validity of the SOP and did not address whether the SOP was consistent with Federal law. Nevertheless, Millcreek also challenged the validity of the SOP on grounds it was an unpromulgated regulation, and sought to establish a factual record, at the hearing, that the SOP was a "binding norm."[12] The ALJ ruled Millcreek could not address this issue either, because the BHA had no power to decide it. The ALJ then limited the hearing to the sole issue of whether the Department abused its discretion by refusing Millcreek's request. When the hearing concluded, the ALJ permitted the parties to brief two issues in addition to those discussing abuse of discretion: (1) which party had the burden of proof; and, (2) the proper scope of review before the ALJ. *Millcreek,* 796 A.2d at 1027. Despite the ALJ's limitation regarding topics to be briefed, the Department's brief addressed the validity of the SOP. In response, Millcreek requested that the particular portion of the Department's brief at issue be stricken or, alternatively, that Millcreek be granted the opportunity to also brief the validity of the SOP and present evidence. The ALJ ordered the discussion of the validity of the SOP be stricken from the

---

**11.** This Court's review is limited to determining whether constitutional rights have been violated, whether an error of law was committed, or whether necessary findings of fact are supported by substantial evidence. *Millcreek,* 796 A.2d at 1024 n. 8.

**12.** Put very simply, if the SOP was found to be a "binding norm," the agency would have no discretion to decide whether or not to

follow the announced policy in an individual case and, thus, would be bound by its contents. *See Department of Environmental Resources v. Rushton Mining Co.,* 139 Pa. Cmwlth. 648, 591 A.2d 1168, 1173 (1991). If a statement is binding on an agency, it is a regulation. Id. We discuss the idea of a "binding norm" in more detail in Section II of this opinion.

Department's brief, stating it was not one of the issues she instructed to be briefed.

Despite these rulings, however, when the ALJ issued her recommendation, *she accepted the Department's contention that the SOP was valid and not a binding norm.* This Court held this action of the ALJ to be a flagrant disregard of the law and a violation of the appellant's due process rights; consequently, we vacated the BHA's order and remanded the case to the ALJ to conduct a de novo hearing and issue a proper adjudication fully addressing, *inter alia,* the legality of the SOP. Id. at 1028, 1030. Since our holding in Millcreek, the legality of the Department's SOP has not been decided by the courts. This case is our first opportunity to decide the merits of the issues raised previously before this Court.

## II. ISSUES

Eastwood raises several arguments on appeal: (1) the SOP is illegal as an unpromulgated regulation; (2) the SOP is illegal because it is inconsistent with federal law and regulations; (3) the BHA's decision is not supported by substantial evidence; (4) there was a violation of its constitutional rights to due process and equal protection; and (5) the ALJ failed to conduct a de novo review, and the Department's decision-making process is fundamentally unfair.

## A. Unpromulgated Regulation

Eastwood first argues that the Department's SOP is not a proper statement of policy, but is, instead, an unpromulgated regulation which is not based upon any statutory authority and violates state laws and regulations. Additionally, Eastwood argues that the SOP represents an impermissible continuation of the CON program after its sunset. The Department counters that it has merely formulated general policy statements which it uses to exercise its discretion under 62 P.S. § 201(2) and 55 Pa.Code § 1101.42(a), and the SOP was formulated to give guidelines to nursing home facilities as to what information the Department considers relevant in making a determination for enrollment. The Department also contends the decision by the Joint Committee on Documents (JCD), not requiring the SOP to be promulgated as a regulation, lends further support to its position.

### 1. *Legal Principles*

■ A determination as to whether a particular statement of policy is an unpromulgated regulation is a question of law. *Millcreek,* 796 A.2d at 1026. We, therefore, review the legal principles applicable to differentiating a regulation from a statement of policy.

■ It is well settled law that an agency's substantive regulations, when properly enacted under the Commonwealth Documents Law (CDL),[13] have the force and

**13.** The Commonwealth Documents Law (CDL), Act of July 31, 1968, P.L. 769, *as amended,* 45 P.S. §§ 1102–1602, sets forth certain requirements an agency must satisfy before a regulation will be valid, including, *inter alia:* (1) giving the public notice of its intent to promulgate, amend or repeal any administrative regulation, 45 P.S. § 1201; (2) accepting, reviewing and considering submitted written comments, 45 P.S. § 1202; (3) obtaining legal approval of the proposed regu-

lation, 45 P.S. § 1205; and (4) depositing the text of the regulation with the Legislative Regulation Bureau for publication, 45 P.S. § 1207. *See also R.M. v. Pennsylvania Housing Finance Agency,* 740 A.2d 302, 306 n. 6 (Pa.Cmwlth.1999). Section 101 of the Commonwealth Documents Law, 45 P.S. § 1101, provided the short title for the act, but was repealed by the Act of July 9, 1976, P.L. 877. In the absence of a new title, we will refer to

effect of law and enjoy a general presumption of reasonableness. *Burstein v. Prudential Prop. and Cas. Ins. Co.*, 570 Pa. 177, 809 A.2d 204 (2002). The CDL defines a "regulation" as "any rule or regulation, or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency." 45 P.S. § 1102(12). When an agency issues a regulation, the CDL requires the agency to provide notice of a proposed rule to the public, receive comments from interested parties, and hold hearings when appropriate. 45 P.S. §§ 1201, 1202; *Giant Food Stores, Inc. v. Department of Health*, 713 A.2d 177, 180 (Pa.Cmwlth.1998).

■ Conversely, an interpretive rule, referred to in Section 102 of the CDL as a "statement of policy," is defined as:

> any document, except an adjudication or a regulation, promulgated by an agency which sets forth substantive or procedural personal or property rights, privileges, immunities, duties, liabilities or obligations of the public or any part thereof, and includes, without limiting the generality of the foregoing, any document interpreting or implementing any act of Assembly enforced or administered by such agency.

45 P.S. § 1102(13). In other words, a statement of policy is "one that *tracks a statute and does not expand upon its plain meaning;* such a rule need not be issued in accord with the CDL." *Giant Food*, 713 A.2d at 180 (emphasis added).

Our Supreme Court, in *Pennsylvania Human Relations Commission v. Norristown Area School District*, 473 Pa. 334, 349, 374 A.2d 671, 679 (1977) (*Norristown*), held that the Pennsylvania Human Relation Commission's definition of a seg-regated school was a statement of policy, which could be adjudicated on a case-by-case basis, rather than a regulation, which had to be promulgated. In making this determination, the High Court was "persuaded by the reasoning of the Court of Appeals for the District of Columbia, a court with extensive experience in reviewing administrative determinations." In its opinion, the Court included a quotation from *Pacific Gas & Elec. Co. v. FPC*, 506 F.2d 33 (D.C.Cir.1974), because it "articulated the distinction between substantive rules which must be promulgated through rule-making procedures and statements of policy which require no such procedures." *Norristown*, 473 Pa. at 349, 374 A.2d at 679. That quotation provides:

> An administrative agency has available two methods for formulating policy that will have the force of law. An agency may establish binding policy through rulemaking procedures by which it promulgates substantive rules, or through adjudications which constitute binding precedents. A general statement of policy is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent but is merely an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications. A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.
>
> . . .
>
> The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings. . . . A properly adopted sub-

the act in this opinion as the CDL. *See R.M.,* 740 A.2d at 305, n. 5.

stantive rule establishes a standard of conduct which has the force of law. . . . The underlying policy embodied in the rule is not generally subject to challenge before the agency.

A general statement of policy, on the other hand, does not establish a 'binding norm'. [It is not finally determinative of the issues or rights to which it is addressed. The agency cannot apply or rely upon a general statement of policy as law because a general statement of policy only announces what the agency seeks to establish as policy.] A policy statement announces the agency's tentative intentions for the future. When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.

*Norristown*, 473 Pa. at 349–50, 374 A.2d at 679 (citations and footnotes omitted) (quoting *Pacific Gas & Elec. Co.*, 506 F.2d at 38). Regarding statements of policy, our Supreme Court further noted in *Norristown*:

As an informational device, the general statement of policy serves several beneficial functions. By providing a formal method by which an agency can express its views, the general statement of policy encourages public dissemination of the agency's policies prior to their actual application in particular situations. Thus the agency's initial views do not remain secret but are disclosed well in advance of their actual application. Additionally, the publication of a general statement of policy facilitates long range planning within the regulated industry and promotes uniformity in areas of national concern.

473 Pa. at 344 n. 17, 374 A.2d at 676 n. 17 (quoting *Pacific Gas & Elec. Co.*, 506 F.2d at 38). Our Supreme Court concluded that the legislature did not intend the agency to have sole discretion in determining when a statement of policy would become a regulation. *Norristown*, 473 Pa. at 351, 374 A.2d at 680.

The Commonwealth Court has also tackled this difficult issue.[14] For example, in *Department of Environmental Resources v. Rushton Mining Co.*, 139 Pa.Cmwlth. 648, 591 A.2d 1168 (1991), the Court elaborated on the distinction between a regulation and a statement of policy by explaining that:

Statements of policy . . . need not be subject to notice and comment [as are regulations] because, presumably, they only provide guidance by which administrative agency personnel carry out their power delegated to them by the General Assembly. Statements of policy are

---

**14.** This Court has previously recognized the difficulty that state and federal courts have experienced when dealing with this particular issue. In *Department of Environmental Resources v. Rushton Mining Company*, the Court noted:

Addressing this problem, the Second Circuit in *Noel v. Chapman*, 508 F.2d 1023, 1030 (2d Cir.1975), *cert. denied*, 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975), stated, "the distinction between a statement of policy and a regulation is enshrouded in considerable smog." More colorfully, the Eleventh Circuit in *Jean v. Nelson*, 711 F.2d 1455, 1488 (11th Cir.1983), stated, "analyzing a rule within the general policy exception is akin to wandering lost in the Serbonian Bog." Despairingly, Kenneth Davis, in his treatise on administrative law, states, "The law on this subject is obviously unsatisfactory, but no one steps forward to remedy its deficiencies. Everyone fails, Congress, courts, agencies, treatise writers." K. Davis, *Administrative Law of The Eighties, 1989 Supplement to Administrative Law Treatise*, § 7.5, p. 235.

*Rushton Mining Co.*, 591 A.2d at 1172 (Pa. Cmwlth.1991); *see also Home Builders Ass'n of Chester v. Department of Environmental Protection*, 828 A.2d 446, 449–50 (Pa.Cmwlth. 2003).

generally considered less structured and significant and, for those reasons, effect the agency belief that a policy is not sufficiently developed to be issued as a regulation.

Id. at 1171.

Shortly after the decision in *Rushton Mining Company*, the Commonwealth Court attempted to further distinguish a regulation and a statement of policy. In *Central Dauphin School District v. Department of Education*, 147 Pa.Cmwlth. 426, 608 A.2d 576 (1992), for example, the Court explained:

A regulation is·a governmental agency's exercise of delegated legislative power to create a *mandatory standard of behavior*. A regulation is binding on a reviewing court if it conforms to the grant of delegated power, is issued in accordance with proper procedures, and is reasonable. In contrast, a statement of policy is a governmental *agency's statutory interpretation* which a court may accept or reject depending upon how accurately the agency's interpretation *reflects the meaning of the statute*.

Id. at 580–81 (emphasis added) (citations and footnote omitted). The Court added that SOPs "provide [agencies] with guidance in ascertaining whether they are conforming to the legislative intent expressed in a statute," and allow "evaluation of [agency] compliance ... on a case-by-case basis." Id. at 582.

▮▮▮ Pennsylvania follows the "binding norm test" to assess whether an agency's pronouncement is a regulation or a statement of policy. *R.M. v. Pennsylvania Housing Finance Agency*, 740 A.2d 302, 307 (Pa.Cmwlth.1999). In *Rushton Mining Company*, this Court elaborated on the idea of a binding norm by explaining that a:

'[b]inding norm' means that the agency is bound by the statement until the agency repeals it, and if the statement is binding on the agency, it is a regulation. . . . [I]n determining whether an agency action is a regulation or a statement of policy, one must look· to the extent to which the challenged pronouncement leaves the agency free to exercise discretion to follow or not follow the announced policy in an individual case.

*Rushton Mining Company*, 591 A.2d at 1173; *see also Home Builders Ass'n of Chester v. Department of Environmental Protection*, 828 A.2d 446, 450 (2003) (discussing how, in Norristown, the Pennsylvania Supreme Court "adopted the federal rational[e] known as the 'binding norm test' to determine when a statement of policy was actually a regulation. . . ."). In ascertaining whether an agency has established a binding norm, the reviewing court must consider: (1) the plain language of the provision; (2) the manner in which the agency has implemented the provision; and, (3) whether the agency's discretion is restricted by the provision. *R.M.*, 740 A.2d at 307; *Millcreek*, 796 A.2d at 1026.

This Court applied the binding norm test in *R.M.* and found the parties were dealing with a statement of policy, and not a regulation. There, a homeowner was unable to pay monthly payments on his first mortgage loan because of personal setbacks, and he applied to the Housing Finance Agency (HFA) for a Homeowner's Emergency Mortgage Assistance Program Loan. HFA denied R.M.'s application because he was financially overextended based upon his income history and there was no reasonable prospect he could resume full mortgage payments within thirty-six months. R.M. appealed, challenging HFA's findings; he argued its denial of his application violated Section 31.206 of Title 12 of the Pennsylvania Code, 12 Pa.Code § 31.206, adopted by HFA pursuant to

statutory authority,[15] supposedly, as an initial program guideline. R.M. asserted this section was, instead, a "regulation,"[16] and appealed the agency's determination to this Court.

We began our analysis in *R.M.* by looking first, as we do here, at the definitions for "regulation" and "statement of policy" included in the CDL, and then to more detailed explanations of the terms included in the Norristown and *Rushton Mining Company* cases. The Court then evaluated the agency's rule pursuant to the three-part "binding norm test" to determine whether Section 31.206 was a regulation or a policy statement.

First, we found the plain language of Section 31.206 favored a finding that a binding norm was *not* created, because the rule did not contain specifications of precise qualifications. *R.M.*, 740 A.2d at 307. Regarding implementation, we held the hearing examiner's reliance upon Section 31.206, when he stated it was " 'binding' [because] 'all criteria need to be met,' " was not probative as to whether the rule was substantive. Id. The Court explained it would expect agency employees to evaluate all sources of information when making a determination as to whether a homeowner qualifies for mortgage assistance, regardless of whether such information was included in a statement of policy or a substantive rule or regulation. Id. Finally, this Court determined that requirements in the rule were flexible and, therefore, not

mandatory. We stated, "[s]uch is the nature of a discretionary rule, not of a substantive one." Id. Accordingly, this Court concluded that Section 31.206 was a statement of policy, not a regulation, and did not have the force and effect of law.

We find an example of a contrary conclusion in *Rushton Mining Company,* where this Court applied the binding norm test, and found a regulation rather than a statement of policy. *Rushton Mining Company* involved the issue of whether standard conditions in mining permits were invalid because they were regulations and not properly promulgated in accordance with Sections 201 and 202 of the CDL or, rather, were statements of policy that did not require promulgation. In determining that the Department of Environmental Regulation's (DER) policy statements were regulations requiring promulgation, the *Rushton* Court concluded that "the DER sets forth a comprehensive system regarding mining operations which provides conditions precedent in order to mine coal in Pennsylvania ... [and has] a significant impact on the Coal Mine Operators." *Rushton Mining Company,* 591 A.2d at 1173. We stated:

Applying the binding norm test to these conditions, the DER is attempting to implement a uniform state-wide policy for certain aspects of mine operations. Inherent in a statewide policy is that the regulations will necessarily be binding

---

**15.** *See* Section 404–C of the Housing Finance Agency Law, Act of December 3, 1959, P.L. 1688, added by the Act of December 23, 1983, P.L. 385, *as amended,* 35 P.S. § 1680.404c.

**16.** Section 31.206(b)(1–4) provides in pertinent part:

    (b) The Agency will generally determine that a homeowner demonstrates a reasonable prospect of resuming mortgage payments and paying the mortgage by maturity, despite his current unemployment, if the

homeowner is suffering a financial hardship through no fault of his own and can demonstrate the following:

    (1) A favorable work and credit history.

    (2) The ability and history of paying the mortgage when employed.

    (3) The lack of an impediment or disability that prevents reemployment.

    (4) That he is actively seeking work, as evidenced by a written statement to that effect.

    12 Pa.Code § 31.206(b)(1–4).

on the agency, and none of the agency's personnel will have any discretion to vary those terms and conditions.

*Rushton*, 591 A.2d at 1174.

### 2. *Application—Binding Norm Test*

■ In analyzing whether an agency pronouncement is a statement of policy or a regulation, we note that the agency's characterization of its own rule as a statement of policy "is by no means dispositive on the issue." *R.M.*, 740 A.2d at 307. To satisfactorily determine whether the Department has issued a statement of policy or a regulation, we must analyze the Department's SOP to ascertain whether it establishes a binding norm, which we recognize as "[a] touchstone of a regulation. . . ." *Id.* As previously discussed, in analyzing whether the Department's SOP creates a binding norm, we must consider (1) its plain language, (2) the manner in which it was implemented by the Department, and (3) whether it restricts the Department's discretion. Id.

#### (i) Plain Language

The Department's general policy regarding enrollment and expansion of nursing facilities in the MA program is based upon its conclusion "that, as a general rule, the present complement of nursing facilities participating in the MA Program results in a more than adequate, if not an overabundant, supply of nursing facility services." 28 Pa. Bull. 139 (January 10, 1998). Consequently, the Department *"will* exercise its discretion . . . to *reject* an application of a currently unenrolled nursing facility to

become an enrolled MA provider of nursing facility. services." Id. (citing 55 Pa. Code § 1101.42(a)). Although discretion is mentioned in the section, it is a word without substance: the plain language of the Department's general policy describes *rejection of applicants for enrollment in the MA Program.* 55 Pa.Code § 1187.21a(c)(2)(i).[17]

The Department carefully crafted the provision at issue; in fact, the provision appears to be purposefully written to include pertinent terminology more characteristic of an SOP. However, the application and effect of the language in the provision, taken as a whole, shows the provision to be restrictive, directive, substantive, and, thus, more characteristic of a regulation. The plain language of the provision indicates the Department wrote the provision to restrict its staff from granting any request for enrollment of a nursing facility in the MA program, or expansion of MA beds in a facility currently enrolled. Further, the Department has determined that expansion of beds is not in its best interests, and that it will consider only exceptions to this general rule. Thus, we find the plain language of the SOP establishes a standard of conduct with the force of law, and creates a binding norm.

#### (ii) Implementation

■ Per its definition, a statement of policy is "an announcement to the public of the policy which the agency hopes to implement in future rulemakings or adjudications." *Rushton Mining Co.*, 591 A.2d at 1173. The Department's so-called state-

---

**17.** The Department will grant exceptions to this general rule, but only if the Department finds that it is in *its* best interests to permit the enrollment of a new nursing facility provider. 55 Pa.Code § 1187.21a(c)(2)(ii). An applicant must "request the Department's prior approval and to bear the burden of demonstrating that, under the circumstances, an in-crease in the number of MA-certified beds is in the Department's best interests and that the applicant . . . should be allowed to provide those beds." 55 Pa.Code § 1187.21a(c)(1)(iii). Section 1187.21a(g) provides "guidelines" and describes the types of information required for the Department's evaluation of applicants' exception requests.

ment of policy was implemented almost ten years ago, and quite clearly is not an announcement of the Department's *future* intent. Rather, it announces that *now, in present time,* the Department will not enter into new provider agreements unless the applicant's participation in the MA Program is in the Department's best interests. Therefore, because the SOP is not an announcement of future intent but, instead, of current rules, it appears less like a statement of policy and more like a binding norm.

■ Furthermore, a statement of policy is defined as "a governmental agency's statutory interpretation which a court may accept or reject *depending upon how accurately the agency's interpretation reflects the meaning of the statute.*" *Central Dauphin School District,* 608 A.2d at 580–81 (emphasis added). Here, however, the Department's statement of policy does not accurately reflect the meaning of its enabling legislation.

We note that the Department relies on the Public Welfare Code, which gives it broad authority to administer the MA Program.[18] Pursuant to this statutory authority, the Department has adopted regulations to enable it to manage participation in the MA Program. As one example, Section 9.11 of the Department's regulations states:

> The Department promulgates regulations under its statutory authority. Eligibility and participation requirements for beneficiaries and providers are prescribed in regulations found in this title. This title also applies to programs and services administered, licensed, supervised or funded by the Department. The regulations implement and interpret law and prescribe policy as well as practice and procedure before the Department.

55 Pa.Code § 9.11. However, contrary to this clearly expressed requirement, the Department has failed to promulgate regulations establishing new rules for applicants desiring provider agreements under the MA program. Because the Department issued eligibility and participation requirements through, what it calls, a statement of policy, the SOP violates state law and the Department's own regulations.

Along this same line, as another example, the SOP "dramatically alter[ed]" the Department's existing regulations for participation in the MA program (Eastwood Br. at 40).[19] Since the SOP came into

---

18. For example, the Department, as the single state Medicaid agency, is empowered "to develop and submit State plans . . . to promulgate regulations, establish and enforce standards and to take such other measures as may be necessary to render the Commonwealth eligible for available Federal funds or other assistance." 62 P.S. § 201(2). In administering the MA Program, the Department is authorized "[t]o make surveys and inventories of existing facilities and services as required in connection with such State plans, and to assess the need for the construction, modernization or additional services and to determine priorities with respect thereto." 62 P.S. § 201(3).

19. As explained in Eastwood's brief:

> [Department] regulations provide that **any** nursing facility may apply to participate in the MA program. 55 Pa.Code § 1101.41(a). Prior to the implementation of the SOP, [the Department] **automatically** enrolled a nursing facility in the MA program if the facility was licensed by the Department of Health, and agreed to abide by applicable federal, state and local statutes and regulations and applicable licensing statutes. 55 Pa.Code § 1187.21 . . . . [The Department] did not assess whether there was a need for additional beds before entering into a provider agreement. This fact is confirmed by the SOP, which states that "[the Department] will no longer **automatically** enter into a provider agreement with a nursing facility . . . ." [The Department] automatically enrolled licensed pro-

existence, nursing facilities are no longer automatically enrolled in the program; rather, nursing facilities must first submit and receive Departmental approval of exception requests, based upon their establishment of prior need for additional MA beds, before they can enter into an agreement with the Department to enroll in the program.

In addition, the Department implemented the SOP treating its provisions as "requirements" rather than "guidelines" for determining need; consequently, it resembles an impermissible continuation of the sunset CON program. Applicants must also reference the SOP in order to provide required information to satisfy the different factors under "need," such as: access in the provider's service area; the percentage of MA occupancy for an area; less costly alternatives via the PDA waiver program; and, bed shortages in a given area. *See* 55 Pa.Code § 1187.21a(g).

If the SOP was properly implemented, however, and regarded as a "guideline" by the Department for interpreting its enabling legislation, the SOP would provide factors to *consider* in making a determination. For example, the Department would also look to the actual need of the recipients requesting enrollment, and consider the negative impact that transferring to a different nursing facility would have on particular recipients. Because the ALJ focused only on whether Eastwood met each and every factor listed in the Department's SOP, and refused to acknowledge the importance of other factors that were testified to and required under federal regulations, we find the implementation of the SOP establishes a binding norm.

viders in the MA program once certain basic requirements, which had nothing to do with establishing need, were met.

### (iii) Department's Discretion

Finally, we find the provision, when applied, restricts the agency's discretionary power and is, thus, more like a regulation than a statement of policy. It explicitly provides for the enrollment into the MA program of nursing facilities previously issued a CON but, essentially, denies such participation to non-CON holders. 55 Pa. Code § 1101.42b(a). The plain language of the SOP presupposes that the Department will not approve enrollment or expansion requests because it "has determined that, in most instances, the current complement of nursing facilities participating in the MA Program results in an adequate supply of nursing facility beds for persons who qualify for MA . . . and, therefore, . . . enrollment [and] expansion of existing providers is not in the Department's best interests." (55 Pa.Code § 1187.21a(c)(1)(ii).) Furthermore, the SOP encourages alternatives to MA enrollment and expansion of beds via the PDA waiver program, which are less costly, but not necessarily adequate for all MA recipients. Therefore, the SOP eliminates the discretion on the part of the Department to fund additional enrollment and expansion of MA beds, and we agree with Eastwood that it creates a binding norm.

### 3. *Conclusion*

Upon reviewing the "binding norm test" and applying it to the facts of this case, we conclude that, unlike *R.M.,* but similar to *Rushton Mining Company,* the Department's SOP establishes a binding norm and does not merely serve as an announcement to the public of a policy which the Department hopes to implement in future rulemaking. As such, we find the SOP to be an unpromulgated regulation.

(Eastwood Br. at 42 (emphasis in original) (footnotes omitted).)

## B. Inconsistent with Federal Law and Regulations

Eastwood also contends the Department erred in finding the SOP legal because the SOP violates federal law and regulations.

■ Administrative agencies, such as the Department, have ancillary jurisdiction to determine the validity and application of their own regulations, guidelines, policy statements, and resolutions. *Millcreek*, 796 A.2d at 1025. The Department's "interpretation of its own rules and regulations is entitled to great weight unless it is clearly erroneous or *in conflict with its enabling legislation.*" *Id.* (emphasis added).

■ Participation in a state MA program is voluntary but, to receive federal money to fund the program, its approved plan must meet all requirements of the federal statute and implementing regulations. *Millcreek*, 796 A.2d at 1025. Although states have a certain amount of discretion in formulating the terms of their MA programs, this discretion is not unlimited, because the state must fully comply with the federal statutes and regulations governing the MA program. Id. Federal law requires that states applying for MA must comply with the provisions of Section 1902 of the Social Security Act (Act), 42 U.S.C. § 1396a. A state plan must "provide such safeguards as may be necessary to assure that eligibility for care and services under the plan will be ... provided, in a manner consistent with simplicity of administration and the *best interests of the recipients.*" Section 1902(a)(19) of the Act, 42 U.S.C. § 1396a(a)(19) (emphasis added). Among other things, the state MA program must also "provide such methods ... relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services

and to assure that payments are consistent with efficiency, economy, and *quality of care* ...." Section 1902(a)(30)(A) of the Act, 42 U.S.C. § 1396a(a)(30) (emphasis added).

■ In the case at bar we agree with Eastwood's contention, and find the ALJ and Department erred when they found the SOP consistent with federal law. The ALJ quotes, in her opinion, the above-outlined requirements of federal law, which require the Department to administer the state MA program in a manner that: (1) is "consistent with ... the best interests of the recipients," and (2) provides the methodology to ensure that "care and services available under the plan ... are consistent with quality of care." However, *the ALJ did not consider these provisions in her determination.*

Instead, the ALJ relied **only** on the Department's SOP, which requires administration of the MA program to be accomplished in the "best interests of the *Department.*" The ALJ summarily dismissed the federal requirements by stating that both interests, i.e., those of the recipients and of the Department, are "congruent." (ALJ Adjudication at 42.) While we agree there may be times when the best interests of the recipient and the best interests of the Department *overlap,* these interests are *not* always *congruent* and, in reality, may at times be radically at odds with each other. That is the situation in the case *sub judice.*

We acknowledge the fact that the ALJ chose to credit the Department's witnesses over Eastwood's, which is solely within her discretion as the fact finder. *Colonial Gardens Nursing Home v. Department of Health,* 34 Pa.Cmwlth. 131, 382 A.2d 1273, 1276 (1978). However, in her discussion, the ALJ failed to even mention two critical witnesses who testified on behalf of East-

wood. The first witness, Dr. George Miles, Medical Director of Eastwood for the past 15 years, testified that, in addition to being affiliated with Eastwood, he has also been a board certified doctor at Easton Hospital for 29 years. (Hr'g Test. dated 11–15–01 at 96–97.) Dr. Miles testified that he was involved in Eastwood's decision to seek enrollment in the MA Program because of the problem of providing continuity of care and retaining residents in the community close to family and loved ones. (Hr'g Test. dated 11–15–01 at 98.) Dr. Miles testified that residents at Eastwood become familiar with the setting, and moving residents who are MA eligible to another facility is harmful; it causes stress which creates mental problems, and also aggravates existing physical problems. (Hr'g Test. dated 11–15–01 at 99.) In addition, Dr. Miles testified that Eastwood provides intense services to its residents, which is noted for its rehabilitation program. (Hr'g Test. dated 11–15–01 at 100–103, 109–110.)

Ester Demass, a volunteer at Eastwood, was the second critical witness that testified on behalf of Eastwood and was not mentioned by the ALJ. Ms. Demass testified that, in addition to being a volunteer, she also had a family member who lived at Eastwood for nearly nine years, before "her money ran out" and she was forced to move to another nursing facility. (Hr'g Test. dated 11–15–01 at 14.) Ms. Demass testified that her relative died only three months after the move to the other nurs-

ing facility, and that, while her relative was at the other facility, *she was confused as to where she was and she had to use a wheelchair, which she did not use while at Eastwood.* (Hr'g Test. dated 11–15–01 at 15.)

Testimony from both Dr. Miles and Ms. Demass support Eastwood's contention that moving Eastwood residents, who are MA eligible, to a different facility disrupts their continuity of care. This disruption can have a negative impact on the health of MA recipients and must, at least, be considered because Federal law emphasizes the importance of implementing safeguards to assure that care and services "will be provided in a manner consistent with ... the *best interests of the recipient.*" 42 U.S.C. § 1396a(a)(19) (emphasis added).

Another example of how the Department failed to consider the best interests of the MA recipients can by seen by the ALJ's reliance on the SOP's requirement that the Department consider the availability of the PDA waiver program. The PDA waiver program permits the Commonwealth to provide long-term care service in the community, as opposed to an institutional setting. While the PDA waiver program may be an option for some recipients of MA, there was no testimony that it was a realistic option for the Eastwood recipients at issue here. Therefore, we agree with Eastwood that the SOP is inconsistent with the federal enabling legislation.[20]

20. Because we reverse the Department's determination that the SOP was consistent with Federal law, and was not an unpromulgated regulation, there is no need to address Eastwood's remaining arguments. However, we feel it necessary to comment on the ALJ's handling of this case.

As discussed previously, the ALJ took testimony from witnesses on behalf of both Eastwood and the Department. However, the ALJ failed to mention, let alone discuss, two

of Eastwood's witnesses in her adjudication, calling into question whether she considered this evidence in making her determination, particularly since many documents were apparently misplaced.

Additionally, the ALJ excessively delayed her determination in this matter, especially in light of the fact that this case relied heavily on time-sensitive statistical data. Eastwood filed its exception request in June, 2000, and its appeal in January, 2001. Eleven months fol-

## III. CONCLUSION

Accordingly, based on the foregoing opinion, Eastwood's appeal is sustained.

### *ORDER*

**NOW,** November 3, 2006, the order the Department of Welfare, Bureau of Hearings and Appeals, in the above-captioned matter is hereby reversed.

lowing Eastwood's appeal, the BHA conducted hearings on November 14 and 15, 2001. Following the hearings, the parties filed final briefs in the matter on April 22, 2002, at which point the record was closed. It was not until May 20, 2005, *more than three years later,* that the ALJ issued her recommendation that the appeal be denied; however, at the time the ALJ made her determination, she was relying on out-dated statistical evidence. The record indicates that the Department utilized the *"best available"* MA cost report data from *1999 and 2000,* (Hr'g Test. dated 11–14–01 at 35–37; DPW Ex. 25; DPW Ex. 12 "PSA/County Data), and, statistical data on the PDA waiver program from *September 2000."* (Hr'g Test. dated 11–14–01 at 44; *see also* R.R. at 646a.) Additionally, the evidence presented showed that the Department agreed to enroll 180 additional beds in the County and, at the time of the hearing, 120 of those beds were "on line," "40 more were coming on line" and the remaining 20 beds would be decided on after the 40 were on line. (DPW Ex. 12 ManorCare—Bethlehem Township; Hr'g Test. dated 11–14–01 at 39–40; Hr'g Test. dated 11–15–01 at 74–75.) However, as of the date of the ALJ's determination, there was no evidence that these 60 additional beds had come on line. Thus, it is clear that the ALJ, in making her determination in *2005,* declined to recommend enrollment based on statistical information from *1999* and *2000,* and the assumption that 180 additional beds would be opened in the County. Making matters worse, it is now more than *six years* since Eastwood requested enrollment into the MA Program.

Additionally, we note the severity of the Department's failure to not only certify a complete record to this Court, but its continued failure to respond to this Court's orders. On September 8, 2005, this Court issued an order after considering Eastwood's objections to the content of the certified record. In that order, this Court directed the Department to respond to Eastwood's objections, review Eastwood's designation of the contents of the reproduced record and identify which items were filed with it, and explain why such items were not part of the certified record as part of the pleadings, evidence and proceedings before it. On October 5, 2005, this Court again issued an order stating that, in light of the failure of the Department to respond to its previous September 9th order, and it appearing that all items identified by Eastwood were filed with the BHA, directed the Department to certify a supplemental record consisting of all items identified by Eastwood and not included in the previous certified record. The record shows that the Department subsequently filed a Supplemental Record on November 9, 2005; however, according to the Table of Contents of the supplemental certified record, the **BHA was unable to locate a number of documents filed with the BHA, as well as documents issued by the BHA.** Consequently, this Court found the Supplemental Record **"incomplete"** in a subsequent order dated December 6, 2005. In that order, this Court directed Eastwood to prepare a supplemental record consisting of copies of those items previously identified by it that were not contained in the records certified by the Department, which would be treated as a supplemental certified record, "given that DPW has waived any objection to the missing items." (Order, 12–6–05 at 3.) The misplacing of record exhibits and failure to certify a complete record to this Court calls into question the evidence relied on and considered by the ALJ in making her determination.

Finally, we note the carelessness of the ALJ in informing all parties of her adjudication. The ALJ timely served her adjudication on the Department, but failed to initially serve Eastwood. Although Eastwood was not negatively affected, because the Department re-issued the adjudication with a later date so as not to effect the appeal time, we note this error to further highlight the unreliability of the adjudication in this case.