IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dr. Timothy and Debra Shrom,   :
         Petitioners   :
                          :   No. 637 C.D. 2020
      v.   :
                          :   Argued: December 7, 2020
Pennsylvania Underground Storage   :
Tank Indemnification Board,   :
         Respondent   :


BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge[1]
              HONORABLE PATRICIA A. McCULLOUGH, Judge
              HONORABLE MICHAEL H. WOJCIK, Judge


OPINION BY
JUDGE McCULLOUGH                     FILED: August 5, 2021


Dr. Timothy Shrom and Debra Shrom (the Shroms) petition for review from the June 22, 2020 order of the Underground Storage Tank Indemnification Board (Board), which affirmed the denial of the Shroms' claim under the Storage Tank and Spill Prevention Act (the Act).[2] Specifically, the Board found that the Shroms were unable to establish their eligibility for the payment of remediation costs by the Underground Storage Tank Indemnification Fund (Fund) on the basis that the underground storage tanks (USTs or tanks) located on their property were not

---

[1] This case was assigned to the opinion writer before January 4, 2021, when Judge Leavitt completed her term as President Judge.

[2] Act of July 6, 1986, P.L. 169, No. 32, *as amended*, 35 P.S. §§6021.101-6021.2104.

registered, and the required registration fee was not paid, at the time of the fuel release that gave rise to their claim.  We reverse and remand.

## Background

The relevant facts are undisputed, and are derived from the parties' joint stipulations submitted to the Presiding Officer, who heard the Shroms' challenge to the Fund's denial of their claim.  The subject property is located at 435 West Fourth Street, Quarryville, Pennsylvania (the Property).  (Presiding Officer's Findings of Fact (FOF) ¶2.)  Mrs. Shrom inherited the Property following the death of her mother in 2014.  *Id.* ¶5.  At that time, the Property was leased and operated as a convenience store, Subway franchise, and retail fuel sales facility.  *Id.* ¶6.  That lease was pursuant to an oral agreement between Mrs. Shrom and Edward Boornazian or his solely owned limited liability company, Quarryville Subway LLC (Tenant).  *Id.* ¶9.  When Mrs. Shrom inherited the Property, it contained five USTs situated side by side:  three gasoline tanks, a diesel tank, and a kerosene tank.  *Id.* ¶11.  Prior to 2014, Jerome H. Rhoads, Inc., was registered with the Pennsylvania Department of Environmental Protection (DEP) as the owner and operator of the USTs, but on October 16, 2014, that corporation transferred its interest in the tanks to Tenant.[3]  *Id.* ¶¶13-14.

On February 3, 2015, Tenant submitted an amendment to the USTs' registration to the DEP, reflecting Tenant's ownership thereof.  *Id.* ¶¶15-16.  Approximately one year later, in early 2016, Tenant ceased pumping fuel at the

---

[3] Section 503(a) of the Act requires every owner of a UST to "register with the [DEP] each [UST] by completing and submitting the form provided by the [DEP] and by paying the registration fee prescribed by the [DEP] for each underground storage tank . . . ."  35 P.S. §6021.503(a).  "It shall be unlawful for any owner or operator to operate or use, in any way, any [UST] that has not been registered as required by this section."  *Id.*

Property, and on May 17, 2016, Tenant amended the USTs' registration with the DEP to reflect an out-of-service status. *Id.* ¶¶17-18. In April 2017, Tenant vacated the Property, leaving the USTs behind. *Id.* ¶19. On June 4, 2017, the registration for the USTs expired because the registration fee was unpaid. *Id.* ¶20. The DEP sent letters to Tenant at the Property concerning the unpaid registration fee in July, August, and September of 2017. *Id.* ¶¶22-24. On October 13, 2017, the DEP referred the debt to the Pennsylvania Office of Attorney General (OAG). *Id.* ¶26. The OAG sent letters concerning the unpaid fees to the Property in October and November of 2017. *Id.* ¶27. Neither the DEP's nor the OAG's letters were returned as undeliverable, but the Shroms did not reside at the Property and did not open mail addressed to Tenant. *Id.* ¶¶25, 27-28. Thus, the Shroms did not read any of the notices concerning the unpaid registration fee. *Id.* ¶29. Neither the DEP nor the OAG directly notified the Shroms of the unpaid registration fee. *Id.* ¶30.

In 2017, the Shroms engaged a contractor to remove the USTs. *Id.* ¶31. On September 12, 2017, the Shroms' contractor submitted a tank system closure notification form to the DEP, which called for a complete system closure and the removal of all five USTs. *Id.* ¶¶32-33. Dr. Shrom signed the form as the tank system owner, although he later asserted that this was inadvertent because neither he nor Mrs. Shrom ever owned the USTs. *Id.* ¶34. Although the DEP permanent tank closure planning checklist calls for verification that the USTs are registered, no one registered the tanks at that time. *Id.* ¶35.

On December 28, 2017, during the removal of the USTs, a diesel fuel release was discovered.[4] *Id.* ¶36. On January 5, 2018, additional gasoline

---

[4] Section 103 of the Act defines a "release" as follows:

**(Footnote continued on next page…)**

contamination was discovered on the Property. *Id.* ¶37. The Shroms' contractor proceeded to remove the USTs and the contaminated soil. *Id.* ¶38. At the time that the release was discovered, all tank capacity and per-gallon fees (section 705 fees)[5] payable to the Fund were current, because no such fees were required while the tanks were in out-of-service status. *Id.* ¶40. However, the UST registration fee remained unpaid, and the tanks accordingly remained unregistered.

On January 5, 2018, the Shroms' environmental consultant reported the release to the Fund. *Id.* ¶39. The Fund assigned the claim to its third-party claims administrator, ICF, to investigate the Shroms' eligibility for coverage from the Fund.

---

**(continued…)**

> Any spilling, leaking, emitting, discharging, escaping, leaching or disposing from a storage tank into surface waters and groundwaters of this Commonwealth or soils or subsurface soils in an amount equal to or greater than the reportable released quantity determined under section 102 of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980[, 42 U.S.C. §§9601-75], and regulations promulgated thereunder, or an amount equal to or greater than a discharge as defined in section 311 of the Federal Water Pollution Control Act (62 Stat. 1155, 33 U.S.C. § 1321) and regulations promulgated thereunder. The term shall also include spilling, leaking, emitting, discharging, escaping, leaching or disposing from a storage tank into a containment structure or facility that poses an immediate threat of contamination of the soils, subsurface soils, surface water or groundwater.

35 P.S. §6021.103.

[5] Distinct from the registration fees payable to the DEP under section 503 of the Act, section 705(d)(1) requires owners, operators, or certified tank installers to pay fees that are "set on an actuarial basis in order to provide an amount sufficient to pay outstanding and anticipated claims against the [Fund] in a timely manner." 35 P.S. §6021.705(d)(1). With regard to the storage of "heating oil, diesel fuel or other regulated substance," these fees are assessed "per gallon of tank capacity." *Id.* §6021.705(d)(2).

4

*Id.* ¶41. During that investigation, the Shroms' environmental consultant informed them that the UST registration fees had not been paid for 2017. *Id.* ¶42. The following day, the Shroms paid the outstanding registration fees to the OAG's collection agent. *Id.* ¶43.

In a letter dated May 16, 2018, the Fund denied coverage for the Shroms' claim on the basis that the USTs were not registered, and the registration fee was not paid, at the time that the release was discovered. *Id.* ¶44. The Shroms sought review of that decision with the Fund's Executive Director, who affirmed the denial of coverage in a letter dated February 21, 2019. *Id.* ¶45. The Shroms then requested a formal administrative hearing, and a Presiding Officer was appointed to adjudicate the matter. The Presiding Officer agreed that the Shroms were ineligible for compensation from the Fund, and submitted a Proposed Report and Recommendation to that effect with the Board. The Shroms filed exceptions, but the Board adopted the Report in full, concluding that the Shroms were indeed ineligible to receive payment from the Fund.

After the Fund denied them coverage on their claim, the Shroms ceased remediation work on the Property. *Id.* ¶48. By that point, however, they had been billed $170,745.50 for the remediation work. *Id.* ¶46. The Shroms both had recently retired, and due to the significant expense, they do not plan to recommence remediation efforts on the Property unless and until the Fund agrees or is ordered to reimburse them for the cost. *Id.* ¶49.

The legal dispute centers upon the statutory eligibility criteria for payment from the Fund, as interpreted in the decisions of this Court and the Pennsylvania Supreme Court. Section 706 of the Act provides:

> In order to receive a payment from the . . . Fund, a claimant
> shall meet the following eligibility requirements:

5

(1) The claimant is the owner, operator or certified tank installer of the tank which is the subject of the claim.[6]

(2) The current fee required under section 705 has been paid.

(3) The tank has been registered in accordance with the requirements of section 503.

(4) The owner, operator or certified tank installer has obtained the appropriate permit or certification as required under sections 108, 501 and 504[, 35 P.S. §§6021.108, 6021.501, 6021.504].

(5) The claimant demonstrates to the satisfaction of the [B]oard that the release that is the subject of the claim occurred after the date established by the [B]oard for payment of the fee required by section 705(d).

(6) Additional eligibility requirements which the [B]oard may adopt by regulation.

35 P.S. §6021.706.

Applying these statutory requirements, the Board relied upon a series of decisions of this Court and one decision of our Supreme Court, which the Board

---

[6] Notably, the Shroms have repeatedly asserted that they are not the owners of the USTs at issue. Although the owner/operator criterion is an essential eligibility requirement, the Shroms' denial of an ownership interest in the tanks was not the basis of the Fund's denial of their claim, was not asserted as an alternative basis for denial, and has not been pursued on appeal. (Board's Adjudication and Order at 10-11 ("The owner/operator criterion was not . . . a basis for the Fund's denial of the Shroms' claim, and was not at issue in this appeal."); Presiding Officer's Proposed Report and Recommendation at 22 (the owner/operator "criterion was not applied by [the Fund's] third party administrator or Executive Director in denying coverage for the claim, and is not at issue in these proceedings").) As in the proceedings below, because the owner/operator criterion is not at issue in this appeal, we will not address its application.

deemed to be controlling. *See Young's Sales and Service v. Underground Storage Tank Indemnification Board*, 70 A.3d 795 (Pa. 2013) (plurality); *Luther P. Miller, Inc. v. Underground Storage Tank Indemnification Board*, 965 A.2d 398 (Pa. Cmwlth. 2009); *J.D. Pickens (Estate of Sherman) v. Underground Storage Tank Indemnification Board*, 890 A.2d 1117 (Pa. Cmwlth. 2005); *M.H. Davis Estate Oil Co., Inc. v. Underground Storage Tank Indemnification Board*, 789 A.2d 398 (Pa. Cmwlth. 2001). The Board concluded that these decisions require both the section 705 fees and the section 503 registration fees to be paid before the discovery of the release giving rise to the claim in order for the claimant to establish eligibility for payment under section 706(2) and (3). Because the registration fee for the USTs on the Property had not been paid before the discovery of the release on the Property, the Board concluded that the Shroms were not eligible for compensation from the Fund. The Shroms petitioned this Court for review of the Board's order.[7]

## Parties' Arguments

The Shroms' assertion of error is premised upon their suggestion that, in requiring UST registration fees to be paid before the discovery of the subject release, the Board is enforcing a "*de facto* regulation." (Shroms' Br. at 12.) In support, the Shroms cite *Transportation Services, Inc. v. Underground Storage Tank Indemnification Board*, 67 A.3d 142, 155-56 (Pa. Cmwlth. 2013) (Fund's rule that section 705 fees must be paid until a permanent closure report is filed with the DEP was an unlawful *de facto* regulation where it served as a binding norm, had no

---

[7] This Court's standard of review is "limited to a determination of whether the government agency violated constitutional rights, [or] erred as a matter of law or whether its findings of fact are supported by substantial evidence." *Luther P. Miller*, 965 A.2d at 402 n.5.

support in the statute, and contravened statutory procedure for establishing fees). The Shroms contend that, should the Fund wish to enforce a standard requiring USTs to be registered prior to the discovery of a release, then it must promulgate a regulation to that effect in compliance with the Commonwealth Documents Law.[8] Highlighting the distinction between a "regulation" and a mere "statement of policy," the Shroms invoke the "binding norm" test,[9] which, in the Shroms' view, suggests that the Fund's approach in this case amounted to the enforcement of a *de facto* regulation. (Shroms' Br. at 13-15.)

Although the Shroms fault the Board and the Presiding Officer for failing to apply the binding norm test, they acknowledge that the decisions below ostensibly were premised upon case law interpreting the Act's eligibility requirements. *Id.* at 16. Accordingly, the Shroms attempt to distinguish the precedents that the Board and Presiding Officer found controlling. Unlike the registration fees required under section 503 of the Act, the Shroms note that *Young's*, *M.H. Davis*, and *J.D. Pickens* all concerned the payment of section 705 fees. *Id.* at 17. The distinction between section 705 fees and section 503 registration fees is significant, the Shroms argue, because the section 705 fees provide the Fund with liquidity to pay claims, but the registration fees under section 503 are not used in that manner. *Id.* at 17-18. Although *Luther P. Miller* concerned section 503 registration

---

[8] Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§1102-1602; 45 Pa.C.S. §§501-907.

[9] "In ascertaining whether an agency has established a binding norm, the reviewing court must consider: (1) the plain language of the provision; (2) the manner in which the agency has implemented the provision; and, (3) whether the agency's discretion is restricted by the provision." *Eastwood Nursing & Rehabilitation Center v. Department of Public Welfare*, 910 A.2d 134, 144 (Pa. Cmwlth. 2006).

8

fees, the Shroms argue that the precise issue presented in the instant case, concerning the *timing* of the payment of registration fees, was not at issue in *Luther P. Miller*. Rather, the claimant in *Luther P. Miller* argued that out-of-service tanks need not be registered at all—a position that differs from the Shroms' in this matter. *Id.* at 19. The Shroms further contend that their *de facto* regulation argument distinguishes all of the above-cited cases, and renders the instant case more similar to *Transportation Services*, where such an argument prevailed. *Id.* at 20.

By contrast, the Board asserts that there was no error in the denial of the Shroms' claim. The Board first contends that the statutory eligibility requirements are unambiguous concerning registration of USTs, and to the extent that the statute is ambiguous, courts must afford deference to an administrative agency's interpretation of a statute that the agency is charged to enforce. (Board's Br. at 9 (citing *Bethenergy Mines, Inc. v. Department of Environmental Protection*, 676 A.2d 711, 715 (Pa. Cmwlth. 1996)).) The Board emphasizes that eligibility for payment from the Fund requires that the UST "has been registered in accordance with the requirements of section 503." *Id.* (quoting section 706(3) of the Act, 35 P.S. §6021.706(3)). Section 503, in turn, calls for payment of "the registration fee prescribed" by the DEP. *Id.* (quoting 35 P.S. §6021.503(a)). Because it is undisputed that the USTs in question were not registered when the release was discovered or when the Shroms submitted their claim to the Fund, the Board contends that denial of the Shroms' claim was required by the Act.

As was the case below, the Board invokes *Young's*, *M.H. Davis*, and *J.D. Pickens*, but it particularly emphasizes *Luther P. Miller*. Unlike the cases that addressed section 705 fees, the Board contends that *Luther P. Miller* supports its position that section 503 registration fees must be paid prior to the discovery of the

9

release that triggers a claim to the Fund. Comparing the sequence of events in *Luther P. Miller*—the date that registration lapsed, the date that the release was discovered, and the date that the belated registration fees were ultimately paid—the Board argues that the same sequence is present in this case, and similarly demands affirmance. (Board's Br. at 11-12.)

Disputing the Shroms' primary contention in this matter, the Board argues that there is no *de facto* regulation at issue. The Shroms' claim, the Board asserts, was denied on the basis of statutory eligibility criteria and appellate decisions construing those requirements, not pursuant to any unwritten rule or regulation. *Id.* at 13-14. For that reason, the Board rejects the Shroms' comparison to *Transportation Services*. In that case, the Fund had relied upon an asserted requirement that was not contained anywhere in the statute or related regulations. *Id.* at 14 n.3. Here, the Board argues, the registration requirement is an express statutory requirement. For that reason, the Board contends that *Transportation Services* is inapposite, and that the Shroms' *de facto* regulation argument is misplaced.

The Board further differs with the Shroms' assertion that, unlike section 705 fees, the failure to pay UST registration fees poses no threat to the solvency of the Fund. Although the registration fees are not deposited directly into the Fund, the Board asserts that the Fund relies upon the registration information that the DEP provides it, which is used to invoice UST owners so that they may comply with their financial responsibility requirements. *Id.* at 20. The Board argues that, "[i]f tank owners only had to register their tanks in the event of a release that gives rise to a claim, the DEP's data would be skewed, leading to faulty fee revenue projections that could jeopardize [the Fund's] ability to pay claims and maintain financial stability." *Id.* at 20-21. This, in the Board's view, merely underscores "why tank registration is

important to the operation of the DEP *and* [the Fund], and why it is a requirement for eligibility" under the Act. *Id.* at 21 (emphasis in original).[10]

## Discussion

At the outset, we observe that there is no resolution to the instant dispute to be found in existing precedent, and we thus differ with the Board as to the purportedly controlling nature of *Young's*, *M.H. Davis*, *J.D. Pickens*, and *Luther P. Miller*. As the parties recognize, the majority of these precedents concern the payment of section 705 fees, not the registration fees required under section 503.

*M.H. Davis* addressed the timing of payment of section 705 fees—a question of first impression at the time. *M.H. Davis*, 789 A.2d at 402. *M.H. Davis* ultimately held that such fees must be paid prior to the discovery of the release giving rise to the claim. Otherwise, this Court reasoned, "the result would be that a claimant was eligible for retroactive coverage even where there was a failure to make one payment or no payments at all so long as all fees due and owing were paid at the time the claim was submitted." *Id.* at 403-04. This, in turn, "would countenance a situation where coverage is provided after loss is incurred and prior to payment of fees, allowing tank owners and operators to pay fees at their leisure." *Id.* at 404.

*J.D. Pickens* held that the "current" section 705 fees referenced in section 706 include not only the fees presently due and owing, but also past-due fees

---

[10] The Board also suggests that, even if the Shroms cannot obtain payment from the Fund, they are not without recourse, for they may assert a cause of action under the Act to collect damages from any party responsible for the release, for their costs to remediate their property and for diminution of their property value. (Board's Br. at 18-19.) Section 1305 of the Act provides for such private causes of action. *See* 35 P.S. §6021.1305; *see also Centolanza v. Lehigh Valley Dairies, Inc.*, 658 A.2d 336 (Pa. 1995); *202 Island Car Wash, L.P. v. Monridge Construction, Inc.*, 913 A.2d 922 (Pa. Super. 2006); *Krebs v. United Refining Co.*, 893 A.2d 776 (Pa. Super. 2006).

11

from years prior. *J.D. Pickens*, 890 A.2d at 1120. Our Supreme Court's plurality decision in *Young's* held that section 705 fees are not to be assessed on a per-tank basis, but rather with respect to all USTs on the premises. *Young's*, 70 A.3d at 803 (Opinion Announcing the Judgment of the Court); *id.* at 806 (Eakin, J., concurring). This holding is of no relevance to the present issue. Indeed, the cases concerning section 705 fees are noteworthy only inasmuch as they highlight a distinction, discussed below, in the statutory language used to refer to section 705 fees and section 503 registration fees.

We come to *Luther P. Miller*. Unlike the above-discussed precedents, *Luther P. Miller*, like the instant case, concerned UST registration under section 503. The USTs at issue in *Luther P. Miller* were used to store gasoline from 1992 to 1999. *Luther P. Miller*, 965 A.2d at 400. The claimant stopped using the tanks in 1999 and removed as much gasoline from them as was practicable, but some fuel residue remained. *Id.* Although the tanks were out of service, the claimant did not file temporary closure paperwork with the DEP. *Id.* The USTs' registration expired on October 4, 2002. *Id.* A release was discovered on January 13, 2006. *Id.* at 401. The tanks' registration was expired and the tanks' registration fees were delinquent at that time. *Id.* The claimant filed a claim with the Fund on January 19, 2006. *Id.* After filing the claim, and after receiving an enforcement letter from the OAG, the claimant paid the delinquent registration fees on April 18, 2006. *Id.* The Fund denied the claim on September 6, 2006, "because the tanks were not registered and the registration fees were not paid." *Id.* The Board affirmed the denial of the claim on that basis. *Id.* at 402.

This Court agreed. Importantly, unlike the Shroms, the claimant in *Luther P. Miller* did not argue that it was entitled to reimbursement because it

12

ultimately paid the section 503 registration fee, albeit after the discovery of the release giving rise to the claim. Rather, the claimant in *Luther P. Miller* contended that it was eligible for payment from the Fund "because once the product was removed from the tanks and the tanks were taken out of service, they no longer needed to be registered under [s]ection 503 of the Act because the tanks were no longer 'underground storage tanks' as defined in the Act." *Id.* at 403. We rejected the claimant's "contorted interpretation of the Act." *Id.* at 405. We concluded that the Act requires registration of USTs regardless of whether they are actively in use. This Court therefore "agree[d] with the Board that the tanks at issue . . . were required to be registered in accordance with [s]ection 503 of the Act," and the claimant's "failure to comply with the registration requirements" rendered it "ineligible to make a claim for reimbursement from the Fund." *Id.*

The Board is correct that one fact in *Luther P. Miller* was similar to the instant matter—the section 503 registration fee was not paid until after the discovery of the release giving rise to the claim. However, this fact was not the basis of this Court's decision. Rather, *Luther P. Miller* rejected the suggestion that inactive tanks are not subject to the Act's registration requirements. The question of the *timing* of the payment of the section 503 registration fee relative to the discovery of the release was not analyzed or discussed. Accordingly, we disagree with the Board's suggestion that *Luther P. Miller* controls the instant case. Because neither *Luther P. Miller* nor the cases concerning the payment of section 705 fees are dispositive, we thus differ with the Board's view that the rule applied to the Shroms' claim is necessitated by any existing precedent.

We thus turn to the language of the Act itself. In construing the Act, we remain cognizant that the Act is "remedial in nature" and was "created to protect the

13

well-being of the citizenry of Pennsylvania." *M.H. Davis*, 789 A.2d at 403. Indeed, section 109 of the Act expressly directs: "This [A]ct and the regulations promulgated under this [A]ct shall be liberally construed in order to fully protect the public health, welfare and safety of the residents of this Commonwealth." 35 P.S. §6021.109. Bearing these goals in mind, we again note the relevant portions of section 706 of the Act, which set forth the requirements for eligibility for payment from the Fund:

> In order to receive a payment from the . . . Fund, a claimant shall meet the following eligibility requirements:
>
> *       *       *
>
> (2) The current fee required under section 705 has been paid.
>
> (3) The tank has been registered in accordance with the requirements of section 503.
>
> *       *       *
>
> (5) The claimant demonstrates to the satisfaction of the [B]oard that the release that is the subject of the claim occurred after the date established by the [B]oard for payment of the fee required by section 705(d).

35 P.S. §6021.706.

There is no dispute in this appeal as to whether the "current fee required under section 705 has been paid" with respect to the USTs on the Property. 35 P.S. §6021.706(2). Rather, the sole question is whether the tanks have "been registered in accordance with the requirements of section 503." *Id.* §6021.706(3). Importantly, the eligibility criteria set forth in section 706 of the Act do not state expressly *when* the registration requirements must be met, or registration fee paid, relative to

14

discovery of a release or the filing of a claim. This markedly contrasts with the provisions relating to section 705 fees. Section 706 not only specifies that the "current" fee under section 705 must be paid, but it further requires "*that the release that is the subject of the claim occurred after the date established by the [B]oard for payment of the fee required by section 705(d)*." *Id.* §6021.706(5) (emphasis added). Notably absent, however, is any similar timing provision relating to section 503 registration fees.

As a matter of statutory interpretation, it is often noted that "although one is admonished to listen attentively to what a statute says[,] one must also listen attentively to what it does not say." *Thompson v. Thompson*, 223 A.3d 1272, 1277 (Pa. 2020) (citing *Kmonk-Sullivan v. State Farm Mutual Automobile Insurance Company*, 788 A.2d 955, 962 (Pa. 2001)). Moreover, under the doctrine of *expressio unius est exclusio alterius*, "the inclusion of a specific matter in a statute implies the exclusion of other matters." *Id.* (citing *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 812 A.2d 1218, 1223 (Pa. 2002)). These familiar maxims suggest that, if the General Assembly intended to require section 503 registration fees to be paid before the release giving rise to a claim, it would have expressly provided as much, as it did with respect to section 705 fees.

Despite section 706's different treatment of section 705 and section 503 fees, the Fund is treating them identically. Here, the Fund denied the Shroms' claim solely because the section 503 registration fee was unpaid at the time of the discovery of the release. Had section 705 fees been at issue, this would have been a sufficient basis for denial of the claim. *See* section 706(5) of the Act, 35 P.S. §6021.706(5); *M.H. Davis*, 789 A.2d at 404. With respect to the timing of the payment of the

section 503 registration fee, however, the Fund applied an eligibility criterion to the Shroms' claim that does not appear on the face of the statute.

Indeed, in its Adjudication and Order, "the Board acknowledge[d] that the [Act] does not contain an eligibility criterion which expressly provides that the tank must be registered before the release giving rise to the claim is discovered." (Board's Adjudication and Order at 9 n.6; *see also id.* at 22 ("The Shroms are correct when they assert that there is no specific eligibility criterion in the [Act] . . . or the Fund's eligibility regulations, which expressly provides that the tank must be registered before the release giving rise to the claim is discovered.).) Yet, before this Court, the Board asserts that "the subject USTs were not registered and the required registration fee was not paid at the time the releases were discovered, *as required by the clear and unambiguous language* of the governing Act." (Board's Br. at 7.) What the Board asserts to be clear and unambiguous is section 706's requirement that the "tank has been registered in accordance with the requirements of section 503." 35 P.S. §6021.706(3). That language certainly is clear. However, as discussed above, and as the Board expressly recognized below, it is equally clear that the Act does not specify the sequence and timing that the Board now asserts to flow from an unambiguous statutory command.

This brings us to the Shroms' overarching contention—that their claim was denied pursuant to an unlawful *de facto* regulation. As the Shroms note, this Court thoroughly analyzed this theory in *Transportation Services*, 67 A.3d at 153-56. That case involved a dispute as to whether section 705 fees remained due after the USTs had been emptied and rendered inoperable. The Fund there had concluded that, notwithstanding the condition of the USTs, the applicable fees must be paid until a "permanent closure form" is filed with the DEP. *Id.* at 147. The Act, however, did

16

not provide for this process. In weighing whether the rule amounted to a *de facto* regulation, this Court assessed the distinctions between a "regulation" and "statement of policy."

A regulation "has the force and effect of law." *Id.* at 153 (citing *City of Pittsburgh, Department of Personnel and Civil Service Commission v. Pennsylvania Human Relations Commission*, 630 A.2d 919, 921 n. 4 (Pa. Cmwlth. 1993)). A regulation must be promulgated in accordance with the Commonwealth Documents Law; otherwise, it is a nullity. *Id.* at 154 (citing *Germantown Cab Company v. Philadelphia Parking Authority*, 993 A.2d 933, 937 (Pa. Cmwlth. 2010), *aff'd*, 36 A.3d 105 (Pa. 2012)). A statement of policy, by contrast, "expresses, at most, an agency's interpretation of law, as that law is expressed in a statute or a regulation." *Id.* at 153. A statement of policy "expresses what the agency hopes to implement in future rulemakings or 'adjudications,' but has no immediate effect." *Id.* at 155 (citing *Pennsylvania Human Relations Commission v. Norristown Area School District*, 374 A.2d 671, 679 (Pa. 1977)). A statement of policy need not be promulgated under the Commonwealth Documents Law. *Id.* at 154 (citing *Eastwood*, 910 A.2d at 141-42). However, "[i]f an interpretative rule or statement of policy functions as a regulation, then it will be nullified due to the agency's failure to obey the processes applicable to the promulgation of a regulation." *Id.* (citing *Department of Environmental Resources v. Rushton Mining Company*, 591 A.2d 1168, 1171 (Pa. Cmwlth. 1991)).

A regulation, moreover, has the effect of a "binding norm." *Id.* In *Transportation Services*, we further highlighted our Supreme Court's discussion of the distinctions between a "binding norm" and a "statement of policy" in *Norristown*:

> *A general statement of policy* is the outcome of neither a rulemaking nor an adjudication; it is neither a rule nor a precedent but *is merely an announcement to the public of*

17

*the policy which the agency hopes to implement in future rulemakings or adjudications*. A general statement of policy, like a press release, presages an upcoming rulemaking or announces the course which the agency intends to follow in future adjudications.

The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings . . . . *A properly adopted substantive rule establishes a standard of conduct which has the force of law* . . . .

A general statement of policy, on the other hand, does not establish a "binding norm" . . . . *A policy statement announces the agency's tentative intentions for the future.* When the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.

*Transportation Services*, 67 A.3d at 154-55 (quoting *Norristown*, 374 A.2d at 679) (emphasis in original).

The question in *Transportation Services* was "whether the Fund's permanent closure rule for assessing fees functioned as a regulation that had to be promulgated in accordance with the Commonwealth Documents Law or as a guideline." *Transportation Services*, 67 A.3d at 155. Ultimately, we concluded that the rule required formal promulgation of a regulation. First, "the Fund's permanent closure rule establishe[d] a standard of conduct which the Fund applies in all situations now and in the future, which is the hallmark of a regulation." *Id.* Second, "neither the [Act] nor the regulation say anything whatsoever about 'permanent closure.' It cannot be argued, then, that the permanent closure rule 'tracks' the applicable statute and regulation." *Id.* Third, the Act provided "the procedure by which the Fund will establish its fees, *i.e.*, by regulation." *Id.* (citing section

18

705(d)(1) of the Act, 35 P.S. §6021.705(d)(1)). That statutory requirement was a "clear directive," and was "not limited to the amount of the fee; it applies with equal force to the occasion and duration of the fee obligation." *Id.* at 156. The Fund wished to impose a rule not imposed by the Act, requiring the payment of section 705 fees until the filing of a "permanent closure report" with the DEP. "This requires a regulation." *Id.* For those reasons, this Court concluded that the "permanent closure rule operates as a binding norm, or standard of conduct, not an announcement of what the Fund intends for the future." *Id.* That is, the permanent closure rule was an unlawful *de facto* regulation, and was thus "void and unenforceable." *Id.*

The Fund's rule governing the timing of the payment of tank registration fees has much in common with the permanent closure rule invalidated in *Transportation Services*. First, the disqualification rule "establishes a standard of conduct which the Fund applies in all situations now and in the future . . . ." *Id.* at 155. The Fund certainly has behaved as though it lacked any discretion to deviate from this rule, which is further indicative of a "binding norm." *See Eastwood*, 910 A.2d at 144 (directing courts assessing the presence of a "binding norm" to consider, *inter alia*, "the manner in which the agency has implemented the provision" and "whether the agency's discretion is restricted by the provision"). In upholding the Fund's denial of the Shroms' claim, the Fund's Executive Director explained that, because the Shroms had not registered the tanks and paid the registration fee when the release was discovered, he "*must* affirm the decision" of the Fund to deny the Shroms' claim. (Executive Director's Letter at 5 (emphasis added).) This absence of discretion comports with the Fund's position that payment of the section 503 registration fee before the discovery of the release is, as the Presiding Officer put it, a "mandatory condition of eligibility." (Presiding Officer's Proposed Report and

19

Recommendation at 27.)  As in *Transportation Services*, this purportedly mandatory but unwritten rule, or binding norm, thus has "the hallmark of a regulation." *Transportation Services*, 67 A.3d at 155.

Second, like the rule in *Transportation Services*, the Fund's rule relating to the timing of the payment of the registration fee is not based in the language of the Act or the regulations promulgated thereunder.  As the Board acknowledged below, "there is no specific eligibility criterion" in the Act or the Fund's regulations "which expressly provides that the tank must be registered before the release giving rise to the claim is discovered."  (Board's Adjudication and Order at 22.)  "It cannot be argued, then," that this criterion "'tracks' the applicable statute and regulation." *Transportation Services*, 67 A.3d at 155.

Third, section 706 "specifies the procedure by which the Fund will establish" additional eligibility criteria beyond those stated in the statute, "*i.e.*, by regulation."  *Id.*  The final item in section 706's list of eligibility criteria is "[a]dditional eligibility requirements which the [B]oard *may adopt by regulation*." 35 P.S. §6021.706(6) (emphasis added).  There is nothing ambiguous about this provision.  The Fund wishes to apply the same timing requirements to section 503 registration fees that section 706(5) applies to section 705 fees.  Because the Act does not so provide, this "requires a regulation." *Transportation Services*, 67 A.3d at 156.

Below, the Board acknowledged section 706(6), but reasoned as follows:

> The Shroms are correct that the Fund has not promulgated any regulation that codifies the rule that a tank must be registered when the release is discovered, and that neither the Fund nor the [Presiding Officer's Proposed Report and Recommendation] points to any such regulation.  However, the [Fund] is not obligated to promulgate regulations containing additional eligibility requirements, with the operative word in [s]ection 706(6) being "may."  The use of

20

the word "may" indicates recognition by the legislature that the Fund should be afforded some degree of deference and discretion in deciding how best to operate the [Fund] program, including when and whether to promulgate regulations. Operational, administrative, legal, fiscal, policy, and possibly other issues, must be considered when deciding whether to promulgate a regulation, and the fact that [the Fund] has not sought to promulgate an additional eligibility requirement stating that a tank must be registered when the release is discovered can be a function of many considerations. It does not, however, invalidate the basis underlying the denial of the Shroms' claim or change the Board's conclusion that the denial was proper for the reasons explained in this Adjudication.

(Board's Adjudication and Order at 14.) The Board's rationale is problematic both as a matter of administrative law and of statutory interpretation. Certainly, the legislature's provision of authority to an agency to promulgate regulations entails a degree of trust in the wise use of the agency's discretion to do so. However, the use of the word "may" in section 706(6) did not grant a license to adopt unwritten rules of exclusion from eligibility for payment from the Fund. The Board's reading of section 706(6) would allow it to impose additional eligibility criteria that it may *or may not* adopt by regulation. However, under a plain reading of the statute, if the Board wishes to adopt "[a]dditional eligibility requirements," such as the rule applied in the instant case, it has the authority and discretion to do so "by regulation." 35 P.S. §6021.706(6).

The rule applied to the USTs on the Shroms' Property, disqualifying them from eligibility for payment from the Fund, is not found in any statute, regulation, or court decision. However, it "operates as a binding norm, or standard of conduct, not an announcement of what the Fund intends for the future." *Transportation Services*, 67 A.3d at 156. As such, it "must be promulgated as a

regulation in accordance with the Commonwealth Documents Law." *Id.* "Because it was not, the rule is void and unenforceable." *Id.*

We recognize the Board's argument that, "when ascertaining the General Assembly's intent with regard to ambiguous language, courts are to give strong deference to an administrative agency's interpretation of a statute the agency is charged to enforce." (Board's Br. at 9 (citing *Bethenergy*, 676 A.2d at 715; 1 Pa.C.S. §1921(c)(8)).) However, we do not agree with the Board that section 706 of the Act is ambiguous, such that judicial deference to the Board's interpretation would be warranted. Rather, as discussed above, section 706 of the Act makes clear that section 705 fees are to be treated differently than section 503 registration fees, inasmuch as it specifies that the former must be paid before the "release that is the subject of the claim occurred," 35 P.S. §6021.706(5), but is silent as to the latter. In any event, even if some portion of section 706 of the Act could be deemed ambiguous, there is a distinction between the mere interpretation of an ambiguous provision and the addition of extra-statutory requirements that require adoption by regulation. Finally, we find that any deference that would be owed to the Board's position is more than offset by the General Assembly's express direction that the Act "shall be liberally construed in order to fully protect the public health, welfare and safety of the residents of this Commonwealth." Section 109 of the Act, 35 P.S. §6021.109.

These aims are echoed and emphasized in the General Assembly's express findings concerning USTs and the remediation of damage that they can cause. Section 102(a) of the Act provides:

> (a)    Findings enumerated.--The General Assembly of the Commonwealth finds and declares that:

22

(1) The lands and waters of this Commonwealth constitute a unique and irreplaceable resource from which the well-being of the public health and economic vitality of this Commonwealth is assured.

(2) These resources have been contaminated by releases and ruptures of regulated substances from both active and abandoned storage tanks.

(3) Once contaminated, the quality of the affected resources may not be completely restored to their original state.

(4) When remedial action is required or undertaken, the cost is extremely high.

(5) Contamination of groundwater supplies caused by releases from storage tanks constitutes a grave threat to the health of affected residents.

(6) Contamination of these resources must be prevented through improved safeguards on the installation and construction of storage tanks.

35 P.S. §6021.102(a).

The facts of the instant case serve as an example of why liberal construction of the Act is essential. The USTs on the Shroms' Property have contaminated the "lands" of this Commonwealth, a "unique and irreplaceable resource from which the well-being of the public health and economic vitality of this Commonwealth is assured." *Id.* §6021.102(a)(1). The Shroms have sought to remediate this contamination, and as the General Assembly recognized, "the cost is extremely high." *Id.* §6021.102(a)(4). By the time the Fund denied their claim, the Shroms had incurred costs of $170,745.50. (FOF ¶46.) Unsurprisingly given that figure, they do not plan to continue remediating the Property unless they can receive aid from the Fund. *Id.* ¶49. The Fund was established for the purpose of providing

this aid. Section 704(a)(1) of the Act, 35 P.S. §6021.704(a)(1) ("Moneys in the [F]und are hereby appropriated to the [B]oard for the purpose of making payments to owners, operators and certified tank installers of [USTs] who incur liability for taking corrective action . . . caused by a sudden or nonsudden release from [USTs] . . . ."). If the requirements for eligibility for payment from the Fund are read too strictly—or if unwritten requirements are superimposed thereon—those in the Shroms' position may find themselves financially unable to remediate the damage caused by ruptures of USTs, posing "a grave threat to the health of affected residents." 35 P.S. §6021.102(a)(5). In light of the importance of the Act's express goals, and construing the Act liberally to protect public health, safety, and welfare, as we must, we will not read any additional eligibility requirements into section 706 that do not appear in the text thereof, or in the regulations duly promulgated thereunder.

Finally, we recognize but reject the Board's arguments concerning the purported risk that a payment to the Shroms would pose to the Fund's solvency. As the Shroms note, an additional distinction between section 705 fees and section 503 registration fees, beyond those discussed above, is that the former are used to pay claims, and the latter are not. The fees specified under section 705 are "set on an actuarial basis in order to provide an amount sufficient to pay outstanding and anticipated claims against the [Fund] in a timely manner" and "to meet all other financial requirements of the [B]oard." Section 705(d)(1) of the Act, 35 P.S. §6021.705(d)(1). By contrast, under section 503, tank registration fees are "collected by the [DEP]" and "shall be used to fund the development and operation of the storage tank programs established by this [A]ct," but not directly to pay claims against the Fund. Section 503(c) of the Act, 35 P.S. §6021.503(c). In light of this distinction, paying the Shroms' claim would not appear to pose any imminent risk to

24

the Fund's solvency. The Board recognizes the distinction, but argues that the Fund uses data provided to it by the DEP to maintain the contact information of tank owners, and if those tank owners do not maintain the registration at all times, the "DEP's data would be skewed, leading to faulty fee revenue projections that could jeopardize [the Fund's] ability to pay claims and maintain financial stability." (Board's Br. at 21.) This may be true. However, if such consequences are likely to flow from the gap in the statute that we have discussed herein, then it would be a worthwhile endeavor to resolve the matter through a duly promulgated regulation, thereby placing the public on notice of the consequence that will follow from the failure to pay a UST registration fee within the time frame that the Fund prefers.

We reverse the order of the Board and remand for computation of the amount of coverage for the Shroms' claim for remediation costs.

 

 

 

_____

PATRICIA A. McCULLOUGH, Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Dr. Timothy and Debra Shrom, : 
                Petitioners :
                 :   No.  637 C.D. 2020
           v. :
                 :
Pennsylvania Underground Storage :
Tank Indemnification Board, :
               Respondent :

## ***ORDER***

AND NOW, this 5th day of August, 2021, the order of the Pennsylvania Underground Storage Tank Indemnification Board is REVERSED, and this matter is REMANDED for further proceedings consistent with the attached opinion.

Jurisdiction relinquished.

_____
PATRICIA A. McCULLOUGH, Judge