# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert Rossman, in his official : 
capacity as member of the Potter : 
County Board of Elections, : 
                Petitioner : 
                 : 
           v. :   No. 516 M.D. 2024
                 : 
Department of State of the : 
Commonwealth of Pennsylvania, : 
and Al Schmidt, in his official : 
capacity as Secretary of the : 
Commonwealth, : 
            Respondents :   Argued: October 7, 2025


BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
             HONORABLE ANNE E. COVEY, Judge
             HONORABLE MATTHEW S. WOLF, Judge


## OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE WOLF                    FILED: December 8, 2025


Before the Court are (1) preliminary objections filed by the Pennsylvania Department of State (Department) and Al Schmidt, in his official capacity as Secretary of the Commonwealth (Secretary, and with the Department, Respondents) to the original jurisdiction petition for review filed by Robert Rossman, in his official capacity as a member of the Potter County Board of Elections and Registration Commission (Petitioner); and (2) Petitioner's and

Respondents' cross-applications for summary relief.[1] We conclude initially that Petitioner has standing to bring this action, which challenges a directive issued by the Secretary regarding Petitioner's duties as an elected official when accepting applications to register to vote. But we also conclude that the Secretary's directive is consistent with Petitioner's statutory duties, so Respondents are entitled to summary relief in their favor. Accordingly, we overrule Respondents' first preliminary objection, grant Respondents' cross-application for summary relief, and dismiss the petition for review.

## I. BACKGROUND

Petitioner filed this petition for review in our original jurisdiction seeking declaratory and injunctive relief. The petition alleges the following facts, which are undisputed. Petitioner is an elected county commissioner of Potter County. Pet. ¶ 10. As such, under the statute commonly called the Pennsylvania Voter Registration Act (Registration Act),[2] Petitioner is a statutorily designated member of the "commission" that oversees the registration of electors in Potter County. Pet. ¶ 10. Thus, Petitioner has powers and duties related to voter registration. *Id.* The Department is authorized under the Registration Act to take certain actions regarding voter registration, and the Secretary is the chief officer charged with overseeing the Department and its duties, including prescribing voter registration forms and "promulgat[ing] regulations necessary to establish, implement and administer" the Statewide Uniform Registry of Electors (SURE system). *Id.* ¶¶ 11-12 (quoting 25 Pa. C.S. § 1222(f)).

---

[1] By May 29, 2025 Order, this Court determined that this matter involves purely legal questions, ordered Respondents to file a cross-application for summary relief, and directed that the cross-applications be considered simultaneously with the preliminary objections.

[2] 25 Pa. C.S. §§ 1101-1906.

Under the Help America Vote Act of 2002 (HAVA),[3] all applications for voter registration must include at least one of three pieces of identifying information: a driver's license number, the last four digits of a Social Security number (SSN), or a statement that the applicant has neither a driver's license nor an SSN. *Id.* ¶¶ 13-15. HAVA does not require officials to reject an application if the number provided does not match the applicant's identity, but it does require that state officials have access to Social Security and driver's license databases and that they determine that the application provides enough information to comply with state law before accepting it. *Id.* ¶¶16-18. The SURE system, created by Pennsylvania statute before HAVA, satisfies HAVA's requirement for a statewide database that assigns a unique identifying number to each registered voter in the state. *Id.* ¶¶ 19-21 (citing 52 U.S.C. § 21083(a)(1)(A)(iii)). In 2003, the Department promulgated regulations governing the SURE system. *See* 4 Pa. Code Ch. 183.

The Registration Act and SURE system regulations establish the following registration process. A voter registration application must have a space for the voter's driver's license number or the SSN, 4 Pa. Code § 183.1(a); and the application must be on an official form provided by the Secretary, by the Pennsylvania Department of Transportation (PennDOT) if registering while obtaining a driver's license, or by the Federal Election Assistance Commission (FEAC), 25 Pa. C.S. §§ 1323-24(a). Upon receiving the application, a registration commission or commissioner must determine whether the application is "complete" and "[w]hether the applicant is a qualified elector." 25 Pa. C.S. § 1328(a)(2)(i)-(ii). If it is not properly completed and the commission cannot with reasonable efforts obtain the missing information, it must reject the application. *Id.* § 1328(b)(2)(i). If

---

[3] 52 U.S.C. §§ 21081-21085, 21101-21102.

3

the application "contains the required information indicating that the applicant is a qualified elector," the commission must accept the application. *Id.* § 1328(b)(3)(ii). The commission must also use the applicant's name and date of birth to check for a duplicate registration in the SURE system; if it finds a possible duplicate, the commission may use the driver's license number, SSN, or the unique SURE system identifier to determine if it is in fact a duplicate registration. 4 Pa. Code § 183.6(a)(2). If that information is missing from the application, the commission uses the signature to investigate duplicates. *Id.* § 183.6(a)(3).

Since HAVA was enacted, the Department has issued guidance about what a commissioner should do with the driver's license number or SSN on an application. Initially, the Department stated that the application must be rejected unless the number given is "valid." 33 Pa. B. 6340-59 (Dec. 13, 2003). But in a 2006 communication, the Department stated that "the failure to achieve a match between a voter registration application and a record in the Commonwealth's driver's license database or the database of the Social Security Administration is not a reason to reject the application." Pet. Ex. C, at 5.

In 2018, the Department issued a "Directive Concerning [HAVA]-Matching Drivers' Licenses or Social Security Numbers for Voter Registration Applications" (Directive). Pet. ¶ 51 & Ex. D. The Directive states that a registration application where the applicant's name does not correspond to the identifying numbers provided on the application "may *not* be rejected and must be processed like all other applications." *Id.* Ex. D (emphasis in original). The Directive prohibits commissions from placing an application "in 'Pending' status while a county is doing follow-up with an applicant whose driver[] license or [SSN] could not be matched" and provides that such applications "**MUST** be accepted, unless the

4

county has identified another reason to decline the application." *Id.* (emphasis in original). The Directive purports to rely on "state and federal law" and was not promulgated as a legislative regulation. Pet. ¶¶ 56-58.

According to a 2019 Auditor General's report, of the 8.6 million voter registrations in the SURE system, more than 600,000 lack a driver's license number. *Id.* ¶ 63 & Ex. E. The report identifies 37,000 *potential* SURE system duplicate registrations, based on analysis of the driver's license number and/or SSN. *Id.* ¶¶ 64-65. Duplicate registrations could facilitate voters committing the criminal offense of voting more than once in a single election. *Id.* ¶ 66. There have been "rare" prosecutions for double voting in a few counties in 2024. *Id.* ¶¶ 67-68 & n.4.

Petitioner, as a commissioner, faces potential criminal penalties for not following the legal requirements of the registration process. For example, it is a misdemeanor for anyone to "[k]nowingly and intentionally prevent an applicant who is a qualified elector from being registered." 25 Pa. C.S. § 1711(a)(1). For a commissioner, it is a misdemeanor to "knowingly register[] or permit[] the registration of an applicant not lawfully entitled to be registered," *id.* § 1702(a), to "[i]ntentionally fail to make a transmission under Section 1328 (relating to approval of registration applications)," *id.* § 1712(a)(2), to "without reasonable cause, refuse[] to register a qualified elector lawfully entitled to be registered," *id.* § 1702(b), or "to intentionally delay[], neglect[] or refuse[] to perform a duty imposed by [the Registration Act]," *id.* § 1706. Pet. ¶¶ 71-73. The Secretary can also file an action to withhold election funding from a county if a commissioner refuses to comply with the Registration Act. *Id.* ¶¶ 75-76.

Because of the Directive, Petitioner has accepted applications where the driver's license number or SSN does not match the applicant's information located in the corresponding database. *Id.* ¶ 77. He believes that because he cannot reject an application based on a mismatch between those numbers and the database, he has been forced to create duplicate registrations. *Id.* ¶¶ 78-80. Absent the Directive, Petitioner would reject applications where the driver's license number or SSN do not match the information in the relevant database, because in his view those applications are "not 'properly completed'" as the Registration Act requires. *Id.* ¶ 84.

The petition for review seeks declaratory and injunctive relief in two counts. In Count I, Petitioner requests a declaration that the Directive requires him to violate Pennsylvania law, because the Directive requires Petitioner to ignore incompleteness in voter registration applications and accept voter registration applications that have less than the minimum data required by law. Petitioner requests an injunction against "enforcement" of the Directive. Alternatively, in Count II, Petitioner seeks a declaration that the Directive is an unlawful *de facto* regulation and, therefore, is void and unenforceable. He seeks an injunction against the Directive unless and until it is properly promulgated as a binding regulation.

## II. ISSUES

Respondents raise two preliminary objections. First, they assert that Petitioner, as a single commissioner, lacks standing to bring this action for the commission as a whole. Second, they raise a demurrer to the legal sufficiency of both counts of the petition for review. Respondents seek summary relief and dismissal on those same bases, including their position on the merits that the

6

Directive does not conflict with state law. Petitioner seeks summary relief on both counts, claiming no facts are disputed and he is entitled to relief as a matter of law.

## III. DISCUSSION

When deciding preliminary objections, we accept as true all well-pled material facts and all reasonable inferences from those facts. *Phantom Fireworks Showrooms, LLC v. Wolf*, 198 A.3d 1205, 1214 n.6 (Pa. Cmwlth. 2018) (en banc). We need not accept unwarranted factual inferences, conclusions of law, arguments, or opinions. *Id.* To sustain preliminary objections, it must be clear that the law will permit no recovery, even resolving doubts in favor of the non-movant. *Id.*

Further, we will grant an application for summary relief in our original jurisdiction only if there are no disputes of fact. *Phantom Fireworks Showroom*, 198 A.3d at 1220. Summary relief "is appropriate where a party asserts a challenge to the constitutionality of a statute and no material facts are in dispute." *Id.*

### A. Preliminary Objections: Standing

Our Supreme Court has explained the requirement of standing as follows:

> In Pennsylvania, a party to litigation must establish as a threshold matter that he or she has standing to bring an action. Standing in Pennsylvania is a jurisprudential matter. In our Court's landmark decision on standing, we explained that a person who is not adversely impacted by the matter he or she is litigating does not enjoy standing to initiate the court's dispute resolution machinery. *William Penn Parking Garage v. City of Pittsburgh*, 346 A.2d 269, 280-81 (Pa. 1975) (plurality). This is consistent with our jurisprudential approach that eschews advisory or abstract opinions, but, rather, requires the resolution of real and concrete issues. As we explained in *In re Hickson*, [821 A.2d 1238, 1242 (Pa. 2003)], the party to the legal action must be "aggrieved."

7

> In determining whether a party is aggrieved, courts consider whether the litigant has a substantial, direct, and immediate interest in the matter. To have a substantial interest, the concern in the outcome of the challenge must surpass "the common interest of all citizens in procuring obedience to the law." *Id.* An interest is direct if it is an interest that mandates demonstration that the matter "caused harm to the party's interest." *Id.* Finally, the concern is immediate "if that causal connection is not remote or speculative." [*Fumo v. City of Phila.*, 972 A.2d 487, 577 (Pa. 2009)]. The "keystone to standing in these terms is that the person must be negatively impacted in some real and direct fashion." *Pittsburgh Palisades Park, LLC v. Commonwealth*, 888 A.2d 655, 660 (Pa. 2005).

*Markham v. Wolf*, 136 A.3d 134, 140 (Pa. 2016) (some citations and footnotes omitted).

Respondents argue Petitioner lacks standing because he is a single member of a collective body, the registration commission in Potter County. They claim that, pursuant to the Registration Act, all actions by the commission are collective in nature, so an individual official like Petitioner does not have control over the commission's decision whether to accept or reject an application. In support, they cite cases where we have held that individual members of local elected bodies lack standing to sue individually on behalf of that body. *See O'Neill v. Phila. Zoning Bd. of Adjustment*, 169 A.3d 1241, 1245 (Pa. Cmwlth. 2017); *Szoko v. Twp. of Wilkins*, 974 A.2d 1216, 1220 (Pa. Cmwlth. 2009). Respondents acknowledge that this general rule has an exception, largely taken from our caselaw on legislative standing: if the member of the body can show harm to his individual interest, such as a restriction on his authority to act in his official capacity, he may have standing. *See Markham*, 136 A.3d at 140-46; *Allegheny Reproductive Health Ctr. v. Pa. Dep't of Hum. Servs.*, 309 A.3d 808, 844 (Pa. 2024). Respondents argue Petitioner has not shown how his ability to act as a commissioner is impacted by the Directive.

8

Petitioner disagrees that the commission's duties are purely collective. He cites several sections of the Registration Act that require "a commissioner" (singular) to, *inter alia*, initial for receipt of the application, examine it, and determine whether it is complete. 25 Pa. C.S. § 1328(a)(1)-(2). The Registration Act vests individual commissioners with power to investigate irregularities, *id.* § 1203, and criminalizes conduct by individual commissioners, as set forth in the petition for review. Thus, Petitioner argues, because of these individual statutory duties and corresponding individual criminal sanctions, his interest in understanding the requirements of the law is greater than those of the general citizen, and he is thus aggrieved by the Declaration. *See Phantom Fireworks*, 198 A.3d at 1215.

We agree with Petitioner that he has standing to bring this action under the facts as alleged in the Petition. Although Respondents are correct that some actions of the commission are purely collective, Petitioner's allegations persuasively show that other statutory duties relate to him acting as an individual. Petitioner's work as a commissioner is ongoing, and he must choose whether to follow the Directive or his own interpretation of state law. Whether Petitioner's individual actions and choices are undertaken on behalf of the commission is immaterial in this case, because unlike the statutes in many of the cases Respondents cite, the Registration Act would possibly criminally punish Petitioner individually for failing to discharge his duties in accordance with law. Under these allegations, that risk gives Petitioner a substantial, direct, and immediate interest in knowing which instruction he must follow. *See Markham*, 136 A.3d at 140.

Having determined Petitioner has standing to sue under the allegations in the Petition, we will overrule Respondents' first preliminary objection. We turn to the substantive claims of the petition for review, which are the subject of

9

Respondents' second preliminary objection and the cross-applications for summary relief.

## B. Substantive Claims

Petitioner seeks summary relief on Count I based on his view that the Directive requires him to violate the Registration Act by accepting "incomplete" or "not 'properly completed'" applications. He explains that the Registration Act commands rejection of an application that does not contain "the required information" to show the applicant is a qualified elector of the county. 25 Pa. C.S. § 1328(b)(3)(ii). He argues this statutory language can only be construed one way: "[T]hat county registration officials are prohibited from approving an application if there is *a mismatch* between the identifying information listed on the application and the information within PennDOT or Social Security Administration databases." Petitioner's Appl. for Summary Relief at 23 (emphasis added). Petitioner claims "properly complete" must imply that the applicant wrote not just "some 8-digit number" in the blank space for the driver's license number or "some 4-digit number in the blank space for the SSN." *Id.* at 25. Instead, he argues, complete means the number must be known to correspond to the applicant's identity in the SURE system or a separate database before the application can be accepted.

Petitioner maintains that the unambiguous language of the Registration Act requires this, but that it is also consistent with the purpose of the Registration Act to maintain confidence in voter registration, by ensuring at the application stage that the voter has provided an accurate driver's license number or SSN. Petitioner adds that the legal support cited in the Directive itself—that HAVA requires accepting an application even if there is a mismatch—is not settled, so HAVA would permit rejection of applications with mismatches.

10

Respondents seek summary relief on Count I because they view the Directive as completely consistent with state law. First, Respondents point out that the requirement for a driver's license number or SSN comes from HAVA, not from the Registration Act. Respondents acknowledge that the SURE system regulations do require the form application *to have a space for* the applicant to give the driver's license number or SSN. *See* 4 Pa. Code § 183.1. But they emphasize that this is not the same thing as requiring commissioners to reject an application, not because it is *missing* those numbers the application requires, but because of a *mismatch* between the numbers given and other voter information. Thus, Respondents argue, Petitioner's claimed interpretation of the Registration Act and its regulations—that they require rejection based on a mismatch—is an overreading of state law.

Respondents also argue that the Directive is consistent with the structure of the Registration Act. The Directive requires commissioners not to reject an application based on a mismatch alone, which appears to be Petitioner's view of the statutory mandate. Instead, the Directive says that the proper response for a county that receives an application with a mismatch is to investigate further, because mismatches may have innocuous causes like sloppy handwriting or data-entry errors, so they do not necessarily indicate ineligibility. They emphasize that the Registration Act specifically requires such investigation as the remedy, and not rejection, which is the same thing the Directive says. *See* Respondents' Br. in Support of Summary Relief at 10; Respondents' Br. in Opposition to Summary Relief at 28.

As to Count I, we are persuaded by Respondents' arguments that the Directive is not inconsistent with the Registration Act or its regulations. Under those laws, the requirement is for the application to be "complete," that is, that the

applicant has provided the information requested on the application form. Petitioner appears to draw an inference that is one step beyond the statutory requirement: that the information must not only be complete, but also *correct*, that is, not a mismatch. And more tenuously, Petitioner claims the required remedy or response to that mismatch under the law is *to reject* the application. As Respondents explain, however, state law requires a different response: the commissioner must *investigate* to determine if the mismatch relates to a duplicate registration. The statute and its regulations give commissioners the power to investigate for just this reason, including by using the applicant's name and date of birth to check against the SURE system. If the mismatch Petitioner invokes turns out, after investigation, to reveal a duplicate, then both state law and the Directive require rejection. But state law does not authorize an out-of-hand rejection based merely upon a mismatch in the driver's license or SSN databases, without investigation. The Directive, consistent with those provisions, forbids that sort of summary rejection. It thus does not require Petitioner to act inconsistently with his obligations under the Registration Act. Accordingly, we conclude that the Secretary is entitled to judgment as a matter of law on Count I.

Regarding Count II, Petitioner claims the Directive is an unpromulgated-yet-binding regulation, and is thus invalid because it did not follow proper procedure. Respondents contend the Directive is an interpretive regulation, which creates no new legal obligations and merely clarifies how the Secretary interprets the requirements of the Registration Act. Our courts distinguish between legislative and interpretive regulations as follows:

> [A] regulation may be either binding (legislative) or merely entitled to deference (interpretive). Generally, a legislative regulation establishes "a substantive rule

12

creating a controlling standard of conduct." *Borough of Pottstown v. Pa. Mun. Ret. Bd.*, 712 A.2d 741, 743 (Pa. 1998) (*Pottstown*). A legislative regulation is valid if adopted pursuant to delegated legislative power, in accordance with the appropriate administrative procedure, and is reasonable. By comparison, an interpretive regulation merely construes and does not expand upon the terms of a statute. *See Pottstown*, 712 A.2d at 743. An interpretive regulation is valid if it "genuinely track[s] the meaning of the underlying statute." *Id* . . . .

*Slippery Rock Area Sch. Dist. v. Unemployment Comp. Bd. of Rev.*, 983 A.2d 1231, 1236 (Pa. 2009) (citation omitted).

We agree with Respondents that the Directive is an interpretive regulation, not a legislative, and thus did not require promulgation. As we have determined, the Directive tracks the meaning of the Registration Act and its regulations, and it does not obligate Petitioner to any conduct that would not otherwise be required of him under extant state and federal law. Thus, Respondents are entitled to judgment in their favor on Count II.

## IV. CONCLUSION

For the foregoing reasons, we overrule Respondents' first preliminary objection, concluding that Petitioner has standing to bring this action. Further, we grant Respondents' cross-application for summary relief and dismiss the petition for review.[4]

_____
MATTHEW S. WOLF, Judge


Judge Wallace did not participate in the decision in this matter.

---

[4] Given this conclusion, we dismiss as moot Respondents' second preliminary objection in the nature of a demurrer and Petitioner's application for summary relief.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Robert Rossman, in his official     :
capacity as member of the Potter   :
County Board of Elections,      :
                Petitioner  :
                             :
        v.             :  No.  516 M.D. 2024
                             :
Department of State of the      :
Commonwealth of Pennsylvania, :
and Al Schmidt, in his official    :
capacity as Secretary of the     :
Commonwealth,            :
           Respondents   :

# O R D E R

AND NOW, this 8th day of December, 2025, the preliminary objection filed by the Pennsylvania Department of State and Al Schmidt in his official capacity as Secretary of the Commonwealth (Respondents) regarding standing is OVERRULED. Respondents' Cross-Application for Summary Relief is GRANTED and the petition for review filed by Robert Rossman, in his official capacity as a member of the Potter County Board of Elections (Petitioner) is DISMISSED. Respondents' remaining preliminary objection and Petitioner's Application for Summary Relief are DISMISSED as moot.

                                           _____
                                           MATTHEW S. WOLF, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Robert Rossman, in his official capacity as member of the Potter County Board of Elections, | : : : | |
| Petitioner | : : | |
| v. | : : | No. 516 M.D. 2024 |
| Department of State of the Commonwealth of Pennsylvania, and Al Schmidt, in his official capacity as Secretary of the Commonwealth, | : : : : : : | Argued: October 7, 2025 |
| Respondents | : | |

BEFORE:   HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE MATTHEW S. WOLF, Judge

## ***OPINION NOT REPORTED***

CONCURRING AND DISSENTING OPINION
BY JUDGE McCULLOUGH                          FILED: December 8, 2025

Because I believe the Directive issued by the Department of State of the Commonwealth of Pennsylvania (Department) (together with Al Schmidt, in his official capacity as Secretary of the Commonwealth, Respondents) sometime in 2018 is inconsistent with Pennsylvania voter registration law and is an invalid, unpromulgated regulation, I must dissent in part.

Specifically, I concur with the Majority's conclusion that Petitioner Robert Rossman (Petitioner) has standing to challenge the Directive. I also concur with the Majority's conclusion that Pennsylvania voter registration law requires the rejection of a registration application where irreconcilable inconsistencies in an applicant's identification numbers reveal a duplicate registration.

I dissent, however, to the Majority's conclusion that rejection based on inconsistent identification numbers is mandated *only* where a duplicate registration is uncovered. To the contrary, Pennsylvania voter registration law mandates rejection of applications where inconsistent identification numbers cannot, after investigation, be reconciled for any reason. Because the Directive on its face flatly prohibits rejection based on inconsistent identification numbers *in all circumstances*, it is inconsistent with Pennsylvania law and is invalid.

I further dissent to the Majority's conclusion that the Directive is a valid, unpromulgated "interpretive" regulation. By its plain language, the Directive mandates new rules of conduct for registration commissions and threatens financial penalties for noncompliance. The Department was obligated to duly promulgate the Directive in accordance with established procedures, which it undisputedly did not do. The Directive thus is invalid on this additional ground.

### A. The Directive Violates Pennsylvania Voter Registration Law

**1. Pennsylvania Law Requires Rejection of Registration Applications with Inconsistent Identification Numbers.**

To begin, Section 303(a)(5)(A)(i) of the Help America Vote Act of 2002 (HAVA), 52 U.S.C. § 21083(a)(5)(A)(i), requires that voter registration applications contain certain items of identifying information, including (1) a valid driver's license number (DLN), if issued; or (2) the last four digits of the applicant's Social Security number (SSN). If the applicant has neither of those numbers, a state must issue to the applicant a unique numerical identifier for voter registration purposes. Section 303(a)(5)(A)(ii) of HAVA, 52 U.S.C. § 21083(a)(5)(A)(ii). HAVA further requires that top state election officials enter into information-matching agreements with state motor vehicle authorities "to the extent required to enable each such official to verify the accuracy of the information provided on

applications for voter registration." Section 303(a)(5)(B)(i) of HAVA, 52 U.S.C. § 21083(a)(5)(B)(i). State motor vehicle authorities must also enter into similar agreements with the Social Security Administration. Section 303(a)(5)(B)(ii) of HAVA, 52 U.S.C. § 21083(a)(5)(B)(ii). Despite these requirements, however, HAVA authorizes state registration commissions to determine, "**in accordance with State law**," whether the identifying information provided in a registration application meets HAVA's requirements. 52 U.S.C. § 21083(a)(5)(A)(iii).

In this vein, Section 1382(a)(2) of what commonly is referred to as Pennsylvania's Voter Registration Act, 25 Pa.C.S. §§ 1801-1906, requires county voter registration commissions to examine voter registration applications to determine (1) whether the application is complete; (2) whether the applicant is a qualified elector; (3) whether the applicant has an existing registration record within the Statewide Uniform Registry of Electors, known as the SURE system[1]; and (4) whether the applicant is entitled or qualified to receive a requested registration transfer or change, if applicable. 25 Pa.C.S. § 1328(a)(2). Thereafter, the registration commission *must* determine whether to either accept and process the application or reject it. 25 Pa.C.S. § 1328(b). **A commission may reject a registration applicant for four reasons:**

    (i)   The application was not properly completed **and, after reasonable efforts by the commission to ascertain the necessary information, the application remains incomplete or *inconsistent*[;]**

    (ii)  The applicant is not a qualified elector[;]

    (iii) The applicant is not entitled to transfer of registration or a change of address[; or]

---

[1] *See* Section 1222(a) of the Voter Registration Act, 25 Pa.C.S. § 1222(a).

> (iv)  The applicant is not legally qualified for a change of name.

25 Pa.C.S. § 1328(b)(2)(i)-(iv) (emphasis provided).  If an application is rejected, the commission must **notify** the applicant of the **rejection** and the reasons for it **no fewer than 10 days** prior to the election succeeding the application's filing,  25 Pa.C.S. § 1328(b).  The **applicant** then **may challenge the rejection**.[2]

Consistent with both HAVA and the Voter Registration Act, Section 183.5(a) of The Administrative Code of 1929, 4 Pa. Code § 183.5,[3] provides that "[a] commission shall be responsible for making the final decision to accept or reject an applicant's application to register to vote in accordance with [S]ection 1328 of the [Voter Registration Act] (relating to approval of registration applications)."  Section 183.5(c) of the Department's regulations also consistently provides:

> (c) Except as provided at subsection (d), **a commission shall use reasonable efforts to ascertain information that is necessary for voter registration and is incomplete, inconsistent, or unclear on an applicant's application form. Reasonable efforts shall include mailing a notice to the applicant or contacting the applicant by phone, if available. The commission shall notify the applicant of the reason the application could not be accepted and provide the opportunity for the applicant to complete the form.**

4 Pa. Code § 185.3(c) (emphasis provided); *see also* 4 Pa. Code § 185.3(f)(8) (mandating a commission's consideration of **either (1) the last four digits of the**

---

[2] *See* Sections 1232(a) and 1233(a), (b) of the Pennsylvania Election Code, Act of June 3, 1937, P.L. 1333, *as amended*, added by the Act of October 31, 2019, P.L. 552, 25 P.S. §§ 3072(a), 3073(a), (b) (petition challenging the rejection of a registration application must be filed with the commission by the eighth day preceding an election and, thereafter, with the court of common pleas by the third day preceding an election).

[3] Section 1201(4) of the Voter Registration Act, 25 Pa.C.S. § 1201(4), requires the Department to promulgate regulations necessary to administer voter registration in Pennsylvania.

**applicant's SSN or (2) the applicant's DLN in determining whether to accept or reject the application**).

Thus, pursuant to the express provisions of HAVA, the Voter Registration Act, and the Department's regulations, a registration commission is required to verify the information provided in a registration application, including a DLN or SSN, to determine whether the information is incomplete *or inconsistent* with established government databases. If, after reasonable investigation, the commission is unable to obtain complete information *or reconcile inconsistencies*, it must reject the application.[4]

### 2. The Directive Forbids Rejection of Applications Based on Inconsistent Identification Numbers Where Pennsylvania Law Requires It

Because the Majority does not include it, I provide the language of the Directive in its entirety:

> Pursuant to Section 1803(a) of [the Voter Registration Act], 25 Pa.C.S. § 1803(a),[5] the following Directive is

---

[4] In our unreported decision in *McLinko v. Department of State* (Pa. Cmwlth., No. 1205 C.D. 2024, filed October 20, 2025), the petitioner challenged the Directive under HAVA only, asserting that HAVA itself required rejection of applications where identification numbers in those applications did not match corresponding numbers in government databases. A panel of this Court, relying on our decision in *PA Fair Elections v. Pennsylvania Department of State*, 337 A.3d 598 (Pa. Cmwlth. 2025) (*en banc*), concluded that HAVA did not require rejection of such applications. *Id.*, slip op. at 10-11. The panel went further to conclude, however, that "a nonmatch or mismatch in the DLNs or SSNs provided by the applicant is not a valid reason to reject an application *under the Voter Registration Act*." *Id.*, slip op. at 11 (emphasis provided). Because the challenges involved in both *PA Fair Elections* and *McLinko* were lodged only under HAVA, they are not controlling here. Moreover, any conclusions in those decisions as to the requirements of Pennsylvania voter registration law are nonbinding *dicta*.

[5] Section 1803 of the Voter Registration Act, contained within Chapter 18 ("Enforcement"), provides as follows:

> **(a) General rule.--**The [D]epartment shall have the authority to take any actions, including the authority to audit the registration records

**(Footnote continued on next page…)**

issued by the Department . . . to clarify and specify legal processes relating to HAVA-matching of drivers' license numbers [DLNs] (or [Pennsylvania Department of Transportation (PennDOT) identification] card numbers) and Social Security Numbers [SSNs] when voters submit new voter registration applications or an application to reactivate a cancelled record.

**This Directive underscores that Pennsylvania and federal law are clear that voter registrations may not be rejected based solely on a non-match between the applicants' identifying numbers on their application and the comparison database numbers.**

As stated in the Department['s] . . . August 9, 2006 *Alert Re: Driver's License and Social Security Data Comparison Processes Required by* [*HAVA*], HAVA requires only the following:

(1) that all applications for new voter registration include a current and valid [Pennsylvania DLN], the last four digits of the applicant's [SSN], or a statement indicating that the applicant has neither a valid and current [Pennsylvania] driver's license or [SSN], and

(2) that voter registration commissions compare the information provided by an applicant with [PennDOT's], driver's license database or the database of the Social Security Administration.

---

of a commission, which are necessary to ensure compliance and participation by the commissions.

**(b) Notifications.--**The secretary shall notify the State Treasurer to withhold funds in accordance with section 1804(b) (relating to relief) if a commission fails or refuses to comply with the provisions of this part.

25 Pa.C.S. § 1803(a), (b); *see also* Section 1804(b) of the Voter Registration Act, 25 Pa.C.S. § 1804(b) (requiring the State Treasurer, upon notice, to withhold "any part or all of the State appropriations to which a county is entitled, including funding for the court of common pleas but excluding funding for human services").

HAVA's data comparison process "was intended as an administrative safeguard for 'storing and managing the official list of registered voters,' and not as a restriction on voter eligibility." *Washington* [*Association*] *of Churches v. Reed*, 492 F. Supp. 2d 1264, 1268 (W.D. Wash. 2006).

**Counties must ensure their procedures comply with state and federal law, which means that if there are no independent grounds to reject a voter registration application other than a nonmatch, the application may not be rejected and must be processed like all other applications.**

It is important to remember that any application placed in ["]Pending["] status while a county is doing follow-up with an applicant whose [DLN] or last four of SSN could not be matched MUST be accepted, unless the county has identified another reason to decline the application. Leaving an application in Pending status due to a nonmatch is effectively the same as declining the application while denying the applicant access to the statutory administrative appeals process, and as described above is not permitted under state and federal law.

(Respondents' Br. in Opposition to Petitioner's Application for Summary Relief, Ex. A) (emphasis in original).

The Majority construes the Directive as follows:

If the mismatch . . . turns out, after investigation, to reveal a duplicate [registration], *then both state law and the Directive require rejection.* But state law does not authorize an out-of-hand rejection based merely upon a mismatch in the DLN or SSN databases, without investigation. The Directive, consistent with those provisions, forbids that sort of summary rejection. It thus does not require Petitioner to act inconsistently with his obligations under the [Voter] Registration Act.

*Rossman v. Department of State* (Pa. Cmwlth., No. 516 M.D. 2024, filed December 8, 2025) (Majority Op.), slip op. at 12 (emphasis provided). I agree with the

Majority that the Voter Registration Act does not require an initial, facial rejection of an application merely because an applicant's DLN or SSN cannot be matched with the applicant's corresponding numbers in PennDOT or Social Security Administration databases. Rather, the commission first must investigate inconsistent identification numbers to determine whether they can be reconciled. I also agree with the Majority that the Voter Registration Act mandates rejection of an application if inconsistencies in those numbers, after investigation, ultimately reveal duplicate registrations. At this point, however, I must part ways with the Majority's analysis because the Majority stops there and inappropriately limits rejection to situations where a duplicate registration is discovered.

As set forth above, the Voter Registration Act and the Department's promulgated regulations require rejection of applications that contain inconsistent identification numbers that cannot, after investigation, be reconciled. Neither the Voter Registration Act nor the Department's regulations limit rejection on this ground to only those situations where the inconsistency results in the discovery of a "duplicate" registration, as the Majority suggests. Rather, it is the commission's inability to reconcile the identification numbers in the application that requires rejection. And this makes sense. Identification numbers that cannot be reconciled after investigation could result from a host of causes, most of which likely are benign and can be resolved via the commission's investigation. However, disparate identification numbers can result, not only from duplicate registrations, but also from other kinds of identity fraud perpetuated on registration commissions. For example, made-up identification numbers included in applications submitted with fictitious names would have no analogue in government databases and would not produce a duplicate registration. Similarly, incorrect identification numbers included in an

application submitted unknowingly on behalf of an *unregistered* individual would not produce a duplicate registration. I believe the Voter Registration Act and the Department's regulations plainly were crafted, in light of HAVA's requirements, to protect against such fraud by requiring rejection of applications containing irreconcilably inconsistent identification numbers for any reason.

Despite this, the Directive plainly, and unlawfully in my opinion, prohibits commissions from rejecting applications with irreconcilable identification numbers (other than those that reveal duplicate registrations) *for any reason* and *at any point* in the registration process, whether before or after the commission's investigation. In this regard, the Directive is inconsistent with Pennsylvania voter registration law, which again requires rejection of applications containing inconsistent identification numbers that cannot be reconciled *for any reason.* The Directive does not quote or cite to any substantive provisions of either the Voter Registration Act or the Department's *promulgated* regulations to support its commands and prohibitions and, for that reason, fails to properly guide registration commissions. Rather, as is clear from the necessity of this lawsuit, it has only confused them.

For these reasons, the Directive conflicts with both the Voter Registration Act and the Department's regulations by prohibiting rejection of applications where the law requires it. I accordingly would conclude that the Directive is invalid on that basis.

**B.** **The Directive is an Unpromulgated and Invalid *De Facto* Regulation**

In Count II of the Petition for Review, Petitioner challenges the Directive's validity as an unpromulgated, *de facto* regulation. The Majority, relying on a quotation from the Pennsylvania Supreme Court's decision in *Slippery Rock*

*Area School District v. Unemployment Compensation Board of Review*, 983 A.2d 1231, 1236 (Pa. 2009), distinguishes between binding or legislative regulations and interpretive regulations that are entitled to mere deference. It then construes the Directive as an "interpretive regulation" which, according to the Majority, frees it from any need to be promulgated by the Department. (Majority Op., at 12-13.) The entirety of the Majority's analysis on this issue is as follows:

> We agree with Respondents that the Directive is an interpretive regulation, not a legislative, and thus did not require promulgation. As we have determined, the Directive tracks the meaning of the [Voter] Registration Act and its regulations, and it does not obligate Petitioner to any conduct that would not otherwise be required of him under extant state and federal law.

(Majority Op. at 13.) I cannot agree with either the analytical framework applied by the Majority or its conclusion.

In *Slippery Rock Area School District*, our Supreme Court was presented with only two questions: (1) whether a regulation duly promulgated by the Department of Labor and Industry and codified in the Administrative Code was an interpretive or a binding legislative regulation; and (2) whether the regulation was valid. *Id.* at 1236. It did not consider, address, or conclude anything as to whether a particular pronouncement of a Commonwealth agency, which undisputedly was *not* a regulation promulgated in accordance with applicable procedures, was nevertheless an invalid *de facto* regulation.

Instead, the framework to be applied when considering whether an unpromulgated agency bulletin, statement of policy, or "directive" is an invalid *de facto* regulation clearly has been set forth by this Court in multiple decisions, including *Northwestern Youth Services, Inc. v. Department of Public Welfare*, 1

A.3d 988 (Pa. Cmwlth. 2010). There, we considered whether an administrative bulletin issued by the Department of Public Welfare was an invalid, unpromulgated regulation. *Id.* at 990. Beginning in 2008, the Department of Public Welfare issued administrative bulletins imposing new statewide cost-reporting forms and procedures on county children and youth agencies. *Id.* at 990-91. If county agencies did not follow the new procedures, the Department of Public Welfare would withhold State funding for certain contracted-for services at the county level. *Id*. at 991. Certain providers of those services challenged the validity of one of the bulletins in this Court, seeking a declaration that it was an unpromulgated and invalid regulation. *Id.* The Department of Public Welfare argued in response that the bulletin merely implemented the already-existing audit and reimbursement procedures set forth in its regulations, which implementation could be accomplished by a "directive" or "memorandum." *Id.* at 992.

Thus, the central issue presented by the providers' petition for review was whether the bulletin "was an invalid regulation because it was not promulgated pursuant to the requirements of what commonly is referred to as the Commonwealth Documents Law (CDL).[6] We then applied the following legal principles:

> The determination of whether an agency's pronouncement is an unpromulgated regulation is a question of law. If an agency fails to properly promulgate a regulation in accordance with the CDL, we will declare the pronouncement a nullity.

---

[6] Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102-1602. The CDL imposes formal requirements for the promulgation of an agency regulation, which include the publication of notice, a statement of the statutory or other provision(s) authorizing the regulation, an explanation of the regulation, and an invitation for written comments by interested parties. Section 202 of the CDL, 45 P.S. § 1202.

We begin our analysis by distinguishing a regulation requiring formal promulgation from a statement of policy, which need not be formally promulgated. Our Supreme Court has explained that an agency pronouncement constitutes a regulation when it purports to create a "binding norm":

> "The critical distinction between a substantive rule and a general statement of policy is the different practical effect that these two types of pronouncements have in subsequent administrative proceedings. . . . A properly adopted substantive rule establishes a standard of conduct which has the force of law. . . .
>
> A general statement of policy, on the other hand, does not establish a 'binding norm'. . . . A policy statement, announces the agency's tentative intentions for the future."

*Pennsylvania Human Relations Commission v. Norristown Area School District*, [ ] 374 A.2d 671, 679 ([Pa.] 1977) (citation omitted). "Statements of policy are agency pronouncements that declare, [the agency's] future intentions, but which are applied prospectively on a case-by-case basis and *without* binding effect." *Borough of Pottstown v. Pennsylvania Municipal Retirement Board*, [ ] 712 A.2d 741, 743 n.8 ([Pa.] 1998) (emphasis in original). A statement of policy also tracks the language of a statute and does not expand on its plain meaning. [*Borough of*] *Bedford* [*v. Department of Environmental Protection*], 972 A.2d [53,] 64 [Pa. Cmwlth. 2009 (*en banc*)].

To determine whether an agency has attempted to establish a binding norm, we must consider: (1) the plain language of the enactment, (2) the manner in which the agency implements it, and (3) whether it restricts the agency's discretion, *Cash America Net of Nevada, LLC v. Commonwealth*, 978 A.2d 1028, 1033 (Pa. Cmwlth. 2009) (*en banc*).

*Id.* at 993 (some internal citations omitted); *see also Pennsylvania School Boards Association, Inc. v. Mumin*, 317 A.3d 1077 (Pa. Cmwlth. 2024) (setting forth the same three-part test).

Applying this test, we concluded that the bulletin was an invalid, unpromulgated regulation because (1) it was "replete with mandatory, restrictive language that is indicative of a regulation" and conditioned Department of Public Welfare funding on compliance; (2) it did not announce any future intent of the Department of Public Welfare, but, rather, imposed new cost-reporting requirements that were intended to have retroactive effect; and (3) it did not leave the Department with any discretion to deviate from its terms. *Id.* at 994-95. *See also Cary v. Bureau of Professional and Occupational Affairs*, *State Board of Medicine*, 153 A.3d 1205 (Pa. Cmwlth. 2017) (concluding similarly); *Eastwood Nursing & Rehabilitation Center v. Department of Public Welfare*, 910 A.2d 134, 146-48 (Pa. Cmwlth. 2006) (same).

Here, the **Directive clearly fails this three-part test**. *First*, the Directive is unquestionably binding[7] and purports to forbid county registration commissions from *ever* rejecting registration applications due to mismatches between DLN or SSN numbers provided in registration applications and those contained in established databases. The Directive is issued pursuant to Section 1803(a) of the Voter Registration Act, which provides the Department with an *enforcement* (but not regulatory) mechanism to compel compliance with the statute. Section 1804(b) contains an accompanying enforcement mechanism through which the Department can withhold funding from counties that do not comply with the

---

[7] The Department's counsel indicated at argument that the Directive is intended to be binding on registration commissions.

Voter Registration Act, presumably as the Department has purported to enforce it via the Directive. The Directive contains no general statements of policy, suggestive language, or predictions as to the Department's future course of conduct but, rather, clearly establishes a mandatory standard for registration commissions to follow, at their financial peril if necessary.

*Second*, as to the manner in which the Directive was implemented, there is no indication in the record that the Department provided the public with *any* pre-issuance notice of the Directive's mandates. The Directive is not signed or dated and contains no official seal or other authorization of the Department. It could have been mailed, emailed, or posted on the Department's website, but it certainly was not published in the Pennsylvania Bulletin or any other official publication. Despite its informality, however, the Directive purports to establish binding norms for registration commissions. That in no reasonable fashion can be construed as a mere statement of policy or self-regulating interpretive rule.[8]

*Third*, although the Directive is aimed at local registration commissions, it leaves the Department, to the extent applicable, with no discretion at all as to how the Voter Registration Act must be implemented where identification numbers in registration applications do not match those in established databases.

Because consideration of all three factors indicates that the **Directive is an unpromulgated regulation, it is invalid.** The Majority does not perform this

---

[8] The Directive is not an "interpretive rule" developed by the Department to aid in its own consistent administration of the Voter Registration Act. *See Slippery Rock Area School District*, 983 A.2d at 1237; *Bailey v. Zoning Board of Adjustment of the City of Philadelphia*, 801 A.2d 492, 501 (Pa. 2002). Instead, the Directive, by its own name and language, is aimed at local registration commissions and purports to direct *them*, in binding fashion, as to how they are to carry out their obligations under the Voter Registration Act and the Department's associated (and duly promulgated) regulations.

analysis, but rather starts with the conclusion that the Directive is a regulation and then posits that, because it is "interpretive" (which it is not), it need not be promulgated.[9] That is not the appropriate test under our case law, and it has led the Majority to the wrong conclusion in this instance.

In sum, and for the above reasons, I must concur in part and dissent in part. The Directive **does not follow Pennsylvania voter registration law and is an invalid, unpromulgated regulation**. Accordingly, I would overrule Respondents' preliminary objections, deny their cross-application for summary relief, and grant Petitioner's application for summary relief.

_____
PATRICIA A. McCULLOUGH, Judge

---

[9] As I have demonstrated above, the Directive is mandatory and does not track the meaning of the Voter Registration Act. It therefore is not "interpretive" as the Majority suggests.